[No. S086611. Aug. 22, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES ALLEN MAR, Defendant and Appellant.

## COUNSEL

Carlo Andreani, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, Clayton S. Tanaka, Garrick W. Chock, W. Scott Thorpe and David A. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—In this case we must determine under what circumstances a defendant in a criminal trial in California may be required, as a security measure, to wear a remote-controlled electronic "stun belt"—a device that, in its current design, delivers an eight-second-long, 50,000-volt, debilitating electric shock when activated by a transmitter controlled by a court security officer. The Courts of Appeal have reached conflicting conclusions with regard to whether the principles set forth in this court's decision in *People v. Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1] (*Duran*), establishing the limited circumstances under which a defendant may be subjected at trial to physical restraints such as shackles or manacles,

apply as well to the use of a stun belt, and we granted review in part to resolve that issue. In addition, because this is the first occasion this court has been called upon to address the use of a stun belt in courtrooms in California, we also determine whether there are features and aspects of such a device that are sufficiently distinct to require a trial court to consider additional factors before compelling a defendant to wear one during a criminal trial.

As we shall explain, with respect to the first point we conclude that the Court of Appeal in this case correctly determined that the general principles set forth in *Duran* that apply to the use of traditional types of physical restraints also apply to the use of a stun belt. Unlike the Court of Appeal, however, we further find that the trial court's ruling in this case compelling defendant to wear a stun belt while testifying on his own behalf was erroneous under *Duran*, and also conclude that this error was prejudicial. Accordingly, we conclude that the judgment of conviction must be reversed and the matter remanded for a new trial.

In addition, to provide guidance both to the trial court in this case (should a question as to the potential use of a stun belt arise on retrial) and to other courts that may be faced with the question of the use of a stun belt in future trials, we discuss a number of distinct features and risks posed by a stun belt that properly should be taken into account by a trial court, under the *Duran* standard, before compelling a defendant to wear such a device at trial.

Unlike shackles and manacles, which have been used for hundreds of years and whose operation is predictable and effects well known, the stun belt is a relatively new device with unique attributes and whose use has not been without problems or controversy. In light of the nature of the device and its effect upon the wearer when activated, requiring an unwilling defendant to wear a stun belt during trial may have significant psychological consequences that may impair a defendant's capacity to concentrate on the events of the trial, interfere with the defendant's ability to assist his or her counsel, and adversely affect his or her demeanor in the presence of the jury. In addition, past cases both in California and in other jurisdictions disclose that in a troubling number of instances the stun belt has activated accidentally, inflicting a potentially injurious high-voltage electric shock on a defendant without any justification. The potential for accidental activation provides a strong reason to proceed with great caution in approving the use of this device. Further, because the stun belt poses serious medical risks for persons who have heart problems or a variety of other medical conditions, we conclude that a trial court, before approving the use of such a device, should require assurance that a defendant's medical status and history has

been adequately reviewed and that the defendant has been found to be free of any medical condition that would render the use of the device unduly dangerous.

Finally, inasmuch as the governing precedent establishes that even when special court security measures are warranted, a court should impose the least restrictive measure that will satisfy the court's legitimate security concerns, we conclude that a trial court, before approving the use of a stun belt, should consider whether there is adequate justification for the current design of the belt—which automatically delivers a 50,000-volt shock lasting 8 to 10 seconds, a shock that cannot be lowered in voltage or shortened in duration—as opposed to an alternative design that would deliver a lower initial shock and incorporate a means for terminating the shock earlier. Particularly in view of the number of accidental activations, we conclude that a trial court should not approve the use of this type of stun belt as an alternative to more traditional physical restraints if the court finds that these features render the device more onerous than necessary to satisfy the court's security needs.

## I

Before examining the circumstances relating specifically to the trial court's ruling on the use of the stun belt—the focus of the issue before us—we summarize the facts that gave rise to the underlying criminal charges against defendant James Allen Mar. The following summary is taken largely from the opinion rendered by the Court of Appeal.

## A

### 1. *Prosecution's case*

The evidence presented by the prosecution at trial established that on September 3, 1996, at approximately 3:00 p.m., Deputy Sheriff Raymond Mellon of the Kern County Sheriff's Department went to a residential street in the City of Taft to investigate a report of a disoriented man. Mellon found defendant sitting on a curb, apparently crying. Defendant told Mellon that he could not recall his name, although defendant said he believed his first name might be "Jim." Defendant had no identification on his person or among his belongings, and agreed to accompany Mellon to the Taft Police Department for a fingerprint check to help determine his identity.

Mellon transported defendant, without restraints, to the police department. At the booking counter, defendant recalled his last name and other pieces of

information. The dispatcher conducted a warrant check for "James Mar" and found an outstanding "want" by a parole agent; shortly thereafter, parole agent David Soares telephoned Mellon and asked him to place a parole hold on defendant. At Mellon's request, defendant entered an open booking holding cage and sat down on a bench; Mellon then closed and locked the wire door of the cage and informed defendant that he was under arrest for a parole violation.

Mellon testified that at that point defendant's demeanor abruptly changed. Defendant began pacing the floor, yelling, and pounding on the cage's walls and wire mesh door with his closed fists, threatened to "kick [Mellon's] ass," and challenged Mellon to open the door so they could fight. Sergeant Matthew Holm heard the noise and went to the booking area with another officer to investigate. Defendant threatened to "kick everybody's ass" and continued pounding on the walls and pacing.

Although inmates normally are placed in a jail cell once booking is complete, Holm and Mellon testified that because of defendant's agitated state they were concerned he might injure himself if left in the booking cage or placed in a regular cell, so they decided to move him into a specially padded "detox" cell, whose floor was covered with a rubberized coating. They also hoped that placement in the detox cell might calm defendant down, because an inmate in the detox cell cannot see any jail officers.

Holm testified that he walked to the cage door, told defendant he was going to be moved, and asked for his cooperation. In response, defendant assumed a crouched fighting stance and told Holm to "come on in" so defendant could "kick his ass." Holm testified that as he opened the cage door, defendant rushed head first into Holm's chest, knocking him backwards, and that as Holm fell he hit defendant's head twice with his fist, fracturing one of his (Holm's) fingers and damaging a ligament in his hand. Mellon and another officer then helped subdue defendant, who was handcuffed and moved to the detox cell without further incident. On cross-examination, Holm denied that he and the other officers, annoyed at defendant's loud and profane yelling and antagonistic verbal threats, had entered the cage to quiet defendant down, by force if necessary.

In the course of his testimony, Mellon stated that he did not receive any indication from defendant's appearance that defendant was under the influence of any drug or was mentally ill. Mellon further testified that defendant did not ask to use the telephone, although Holm, in his testimony, stated that he could not recall whether defendant had asked to make a telephone call.

## 2. The defense case

Defendant testified in his own behalf at trial. His testimony confirmed much of the prosecution's evidence, but differed from the officers' testimony on the most significant points.

Defendant testified that he lived in adjacent Santa Barbara County but had traveled to Taft in Kern County a few days before his arrest, without notifying his parole officer, assertedly for a last fling before getting married. Defendant stated that he had gone on a methamphetamine binge, had not slept for two days, and had missed a scheduled meeting with his parole officer at which he was to take a drug test. Defendant testified that he had run out of money, his car had become inoperable, and he felt depressed and anxious because he knew he had violated his parole by leaving the county without notifying his parole officer and by using methamphetamine.

Defendant explained that he planned to turn himself in to the police and to call his parole officer and tell him that he had surrendered in the hope of obtaining leniency for his parole violations. Defendant stated that in furtherance of this plan, he asked a stranger on a residential street to call 911 on his cell phone, and then sat waiting on the curb until a law enforcement officer arrived. Defendant stated that when Deputy Mellon arrived, defendant pretended not to recall his name in order to induce Mellon to take him into custody, and that he readily agreed when Mellon offered to take him to the police station.

Defendant testified that once they arrived at the station, he told Mellon his full name, place of birth, address, driver's license, and the name of his parole officer, emphasizing to Mellon that it was very important to defendant that he be permitted to telephone the parole officer and personally report his parole violations. Defendant stated that after the booking process was completed, he sat in the holding cage for approximately 15 to 20 minutes and again asked to use the telephone, but Mellon did not answer. Defendant said that over the next 10 minutes he asked Mellon four or five more times to use the telephone but did not receive a response from Mellon. Thereafter, when defendant saw Mellon making a phone call and heard Mellon say, "I have one of your parolees in custody," defendant said he became enraged and started shouting obscenities and banging on the cage.

Defendant stated that when Sergeant Holm appeared, defendant loudly demanded to be permitted to use the telephone, telling Holm that Mellon had refused his request. Holm told him to sit down, but defendant continued to pace and demand to make a call. Defendant admitted challenging the officers

to come and fight him, and he stated that when he saw the officers talking together he thought they were going to enter the holding cell to beat him up. He acknowledged briefly adopting a fighting stance, but said that when the cage door opened he "[came] forward and straight to the ground" for self-protection. He said that Holm fell on top of him and someone hit him several times on the back of the head, but defendant said he could not recall lunging into Holm's chest.

Later in his testimony, defendant stated that he knew the officers were entering the holding cage to move him to another cell, and he "wasn't going to cooperate [with them]." He knew he was "going to end up fighting with [the officers], yes." At that point in his testimony, defendant stated he fell on the ground to attempt to prevent the officers from moving him, explaining that "I wanted to make a phone call. I didn't want to be removed from, from where I was at. . . . I wanted to make a point that I wanted my call . . . ."

At the conclusion of his testimony, however, defendant again stated that when Sergeant Holm opened the cell door defendant believed he was going to be attacked by one or more of the officers, and that when he came out of the cell his intention was simply to go down to the ground so he would not be hit—not to fall on or hit Sergeant Holm or prevent the officers from removing him from the cell.

### 3. *Closing arguments and jury verdict*

In closing argument, each side asserted that the evidence supporting its witnesses' version of the incident was more credible. The prosecutor argued that the evidence clearly demonstrated that defendant, by his verbal expletives and threats in the holding cell, willfully had attempted to prevent Sergeant Holm from performing a duty imposed by law, and that defendant also was guilty of willfully resisting an officer with resulting great bodily injury even though Sergeant Holm's injury (the fracture of his finger) resulted directly from Holm's own action in striking defendant's head with his fist, because defendant's willful resistance to the officers' attempt to move him to another cell was a "but for" cause of Holm's injury. In response, defense counsel argued that Sergeant Holm's testimony that he decided to enter the holding cell in order to prevent defendant from injuring himself was not credible, and that it was more reasonable to believe, as defendant testified, that Holm decided to enter the cell in response to defendant's loud and abusive comments in order to quiet him down, that defendant lunged forward and to the floor to protect himself from the anticipated use of force by the officers, and that it was only after Holm had fractured his finger while using excessive force and striking defendant on the

head that the officers, in order to justify Holm's action, came up with the explanation of entering the holding cell to protect defendant from injuring himself.

After deliberation, the jury convicted defendant of violating Penal Code sections 69 (interfering with a peace officer in the performance of his or her duties) and 148.10, subdivision (a) (resisting a peace officer, resulting in serious bodily injury to the officer).

### B

As noted, the issue before this court does not arise out of the facts of the underlying offenses, but rather concerns the trial court's ruling regarding the use of a stun belt at trial.

On the first day of trial testimony, the two law enforcement officers—Mellon and Holm—testified for the prosecution, without apparent incident by defendant. On the morning of the second day of testimony, out of the presence of the jury, defense counsel informed the court "that my client has now had an electronic belt put on him and this is making him very, very nervous and agitated. He's asked that that be taken off while he testifies."

Because of its relevance to the proper application of the governing legal standard, we set forth at some length the subsequent exchange among defense counsel, the court, and defendant as disclosed by the record:

"[Defense counsel]: I explained to him that I didn't know till after he left the courtroom last night that an electronic belt was going to be used on him. I explained to him that the reason that they have decided to use it is because of security purposes, that the jail personnel and the bailiff believes that is necessary. Although he's been unshackled during this process, they feel that it's necessary in case he should erupt in the courtroom based on the past performance when he's erupted in the courthouse here. [¶] I've tried to explain to my client the reason for this. He wants to let the Court know that he is very nervous with that on. He's afraid somebody's going to push the button. He is guaranteeing to me he's not going to erupt in court. [¶] It's very uncomfortable to sit in it. I do know that it sticks out in the back of the shirt and it's hard to lean up against—it's right in the middle and there's no way he can lean up against the chair, and we're asking that the Court allow that to be removed while he is testifying.

"[The Court]: Well, Mr. Mar, I don't want to get into a lot of back and forth with you because I want to talk through your attorney—obviously

that's the purpose of having attorneys represent folks—but I've heard some of the evidence in the case so far. [¶] I wasn't there in Taft when these events took place and that's what this trial is all about is to have the jury try to make a determination whether you had responsibility for the way things developed or whether the officers had responsibility for the way things developed or whether they can't figure it out or whatever, so that's what a jury trial is for. [¶] And obviously what the bailiffs and the guards or security people are concerned about is that you do something here in the courtroom when you're testifying which causes you to lose your self-control and do something that is not only in your worst interest for yourself, but causes them to have to respond in a situation where it's in nobody's best interest, specifically yours, in relationship to the trial. [¶] So the bailiff and the security people are concerned that for whatever reason you do have some strong emotions and you feel those emotions—that's not unusual—but in your situation, because of what happened at Taft and because of an incident, I guess, that happened several—well, a month or so ago in the courthouse in the transportation situation, you got crossways with somebody in the security detail—and I don't know anything about that other than the fact that something did happen—that it's in everybody's best interest to make sure that nothing like that happens in the courtroom during the trial in front of the jury, so I think it's in your best interest to have that there to kind of keep you with a frame of mind that hey, I don't want to do anything that's going to be a problem for me. [¶] So I think the bailiff and the security people have thought that through and think it's probably in your best interest, as well as everybody else's, that you kind of keep in mind that this trial is very important to you, of course, and if anything happens to go wrong, it can't benefit you.

"[Defendant]: I realize that.

"[The Court]: As so I think probably it's my belief that we're all better off if that belt is on, and that gives you a little bit of a feel—that feel of a belt there will give you that feeling that hey, I've got to make sure that I don't get emotionally upset to the point where I do something I can't control, and that's what we're trying to avoid.

"[Defendant]: I don't have a problem.

"[The Court]: I think you're probably better off with it on.

"[Defendant]: I only want to make the point, sir . . . .

"[The Court]: Talk to your attorney, because she should represent you. I don't want you to say something . . . .

"[Counsel]: Mr. Mar is saying, your Honor, that yesterday, when both officers were here testifying that were involved in the charges in this case, that he did not erupt while they were on the stand, he did not do anything out of the ordinary in the courtroom, that he remained cool and calm. His hands were unshackled; his waist was unshackled. He did not even make any comments that were derogatory or anything, or erupt in the courtroom. [¶] He feels that putting the belt on him now is basically creating a difficult mind situation for him to be able to think clearly and be able to testify properly without having a breakdown of his strong emotions. [¶] He feels that if the belt were taken off, that he would not erupt in this courtroom or cause anything. He realizes this is a very important case to him, that he believes that his testimony is very important and necessary in this particular situation, that he would not erupt and cause any problems, and he's asking the Court to please consider and ask that the belt be removed while he's testifying. [¶] If the Court wants him to wear it before he gets on the stand to testify or after he testifies, he's agreeable to do that, but he's asking that it not be on so it won't impede his testimony.

"[The Court]: Well, we've got a little ways to go before we get to that point. I'll think about it, but I do want to observe, counsel, that yesterday, while your client did not say anything and did not do anything that caused the Court to need to warn him, nevertheless, I have noted throughout the proceedings your client does reflect very obviously his consternations, if that's the right word, concerning certain aspects of the evidence as it comes in. [¶] I'm not saying that he did anything that was said out loud or that the jury could hear anything he said, but I have watched and observed that he does reflect very easily if he's not in agreement with an aspect of the testimony or is strongly in disagreement with the testimony and watching him from time to time he does appear to reflect strong emotions and that's what I'm concerned about, but I'll defer till we get to the point and make a decision at that point.

"[Counsel]: Very well, your Honor."

Thereafter, the trial resumed before the jury and the prosecution completed presenting its case-in-chief with the remainder of Sergeant Holm's testimony, again without any incident by defendant.

Prior to the beginning of the presentation of the defense case, in the absence of the jury, defense counsel inquired: "Would the Court reconsider this belt issue?"

The court responded: "Well, I've thought about more of what we said earlier and also have this observation: Obviously there was extensive cross-examination by counsel of the last witness [Holm] and I think it's in Mr.

Mar's best interest to make sure that he doesn't make a bad impression on the jurors as he testifies and, frankly, if he testifies as a reasonable person in light of the cross-examination of the last witness, it's by far and away in his best interest to testify as a reasonable person, without exhibiting any lapses in self-control, and I think the belt is his best insurance that he will come across with self-control, and I think, as a judicial officer, this is a case where, by virtue of the evidence so far, the defendant's self-control as a witness will be in his best interest to make sure that his side of the story is presented and anything that would cause him to exhibit a lack of self-control would be in the People's best interest, and so I think the belt's the best insurance that he has that he will comport himself appropriately in the courtroom, and I say this in light of the cross-examination of the last witness. [¶] I think the jurors understand that the situation that occurred on the date in question is not a clear-cut situation and I don't think Mr. Mar can afford to allow himself to exhibit any conduct or any activity as a witness that would perhaps undo part of what you accomplished by cross-examination, so I think in all fairness to him, given the volatility of some of the situations he's found himself in and how he's responded, the Court's of the opinion it's in his best interest, in the time that he is testifying and the remainder of the trial, that the belt remain on, so that's my decision."

The trial continued, and defendant testified on his own behalf while wearing the stun belt. It is not explicitly apparent from the transcript of the proceedings what effect the stun belt had on the content of defendant's testimony or on his demeanor while testifying. The transcript does reflect, however, that on a number of occasions during his testimony, defendant became excited and apparently spoke very rapidly. At one point, the following exchange occurred between defense counsel and defendant: "[Counsel]: Stop just a minute. You get a little excited; don't you, Mr. Mar?" "[Defendant]: Yeah, I do." "[Counsel]: Have you ever testified before?" "[Defendant]: No." "[Counsel]: Are you a little nervous?" "[Defendant]: Very."

Nonetheless, defendant was able to testify at length to his version of the events. The stun belt was not activated either while defendant was testifying or at any other time during the trial.

## C

As already noted, at the conclusion of the trial the jury returned a verdict finding defendant guilty of the crimes of interfering with a peace officer in the performance of his or her duties and of resisting a peace officer with resulting serious bodily injury to the officer. (Pen. Code, §§ 69, 148.10.) Thereafter, the trial court found true the allegations that defendant had

suffered two prior serious felony convictions within the meaning of the "Three Strikes" law and had served a prior prison term, and it ultimately imposed a state prison sentence of 26 years to life.

On appeal, defendant raised a number of claims, including the contention that the trial court committed reversible error in rejecting defendant's objection to being required to wear a stun belt while testifying at trial. In analyzing the stun belt issue, the Court of Appeal initially concluded that the general rules governing the use of physical restraints during trial, set forth in *Duran, supra*, 16 Cal.3d 282, apply to the use of a stun belt, disagreeing with an earlier Court of Appeal decision in *People v. Garcia* (1997) 56 Cal.App.4th 1349 [66 Cal.Rptr.2d 350] (*Garcia*) that held the use of a stun belt could be justified on a basis less demanding than the one required by *Duran*, because such a belt normally is not visible to the jury. The Court of Appeal in the present case went on, however, to conclude that even under *Duran*'s more stringent standard, the record here supported the use of a stun belt, and thus the court found that the trial court had not erred in overruling defendant's objection to its use. The Court of Appeal also rejected defendant's additional contentions and accordingly affirmed his convictions.

We granted review and limited the issues to be briefed and argued to those relating to the use of the stun belt.

II

A

The trial court record in this case does not contain any facts regarding the physical attributes or function of the stun belt that defendant was required to wear, but numerous legal and nonlegal articles provide a detailed discussion of such stun belts, and the Court of Appeal opinion sets out a description that both parties have accepted as accurate.

As the Court of Appeal explained: "Stun belts are used to guard against escape and to ensure courtroom safety. This device, manufactured by Stun-Tech, is known as the Remote Electronically Activated Control Technology (REACT) belt. The type of stun belt which is used while a prisoner is in the courtroom consists of a four-inch-wide elastic band, which is worn underneath the prisoner's clothing. This band wraps around the prisoner's waist and is secured by a Velcro fastener. The belt is powered by two 9-volt batteries connected to prongs which are attached to the wearer over the left kidney region. Another version of the REACT belt is mainly used when transporting prisoners. It is a clearly visible belt which fastens around the

waist of the prisoner over his or her clothes and has steel handcuff rings attached to the front. (Comment, *The REACT Security Belt: Stunning Prisoners and Human Rights Groups into Questioning Whether Its Use Is Permissible Under the United States and Texas Constitutions* (1998) 30 St. Mary's L.J. 239, 242-243, 246-247 (hereafter *REACT Security Belt*); *People v. Garcia*[*, supra,*] 56 Cal.App.4th 1349, 1354, 1358 . . . .)

"The stun belt will deliver an eight-second, 50,000-volt electric shock if activated by a remote transmitter which is controlled by an attending officer. The shock contains enough amperage to immobilize a person temporarily and cause muscular weakness for approximately 30 to 45 minutes. The wearer is generally knocked to the ground by the shock and shakes uncontrollably. Activation may also cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. An electrical jolt of this magnitude causes temporary debilitating pain and may cause some wearers to suffer heartbeat irregularities or seizures. [Citations.]"[1]

B

As noted, the initial legal question before us is whether the principles set forth by this court in *Duran, supra,* 16 Cal.3d 282, governing the use of physical restraints (such as shackles or manacles) in the courtroom, apply to the use of a stun belt.

---

[1]The St. Mary's Law Journal comment cited by the Court of Appeal is a lengthy and well-researched article that has been cited in a number of prior judicial decisions. (See, e.g., *Hawkins v. Comparet-Cassani* (9th Cir. 2001) 251 F.3d 1230, 1234; *Wrinkles v. State* (Ind. 2001) 749 N.E.2d 1179, 1193.) Its factual description of the REACT stun belt and its operation, of the manufacturer's promotional materials, and of the instances in which the stun belt has been activated are consistent with descriptions reported in numerous other articles. (See, e.g., Hinman, *Stunning Morality: The Moral Dimensions of Stun Belts* (Winter/Spring 1998) 17 Crim. J. Ethics 3; Welsh, *Electroshock Torture and the Spread of Stun Technology* (Apr. 26, 1997) 349 The Lancet 1247; Shaver, *New Tool in Courts: Stun Belts*, Washington Post (Dec. 29, 1998) p. B1; Mahtesian, *A Shocking Way to Keep Order in Court* (Jan. 1995) Governing Magazine <http://www.governing.com/archive/1995/jan/network.txt> [as of Aug. 22, 2002].) Of course, it is customary for the opinions of appellate courts to include citations to the published work of student authors. (See, e.g., Cal. Style Manual (4th ed. 2000) § 3.8, pp. 100-101; ABA, Judicial Opinion Writing Manual—A Product of the Appellate Judges Conference (1991) rule 5.4, p. 71; *Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013, 1020-1021, fn. 4 [111 Cal.Rptr.2d 336, 29 P.3d 797] & accompanying text (plur. opn. of Brown, J.) [stating that "numerous legal commentators have . . . questioned . . . curious omissions [in this court's decision] in *Robins* [*v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341]]," and citing, among other authorities, a student comment in Gonzaga Law Review, a student comment in the University of Richmond Law Review, and a student note in the California Law Review].)

1

In *Duran*, the trial court summarily had rejected an objection by the defendant—a state prison inmate charged with the crime of assault with a deadly weapon by a life-term prisoner (Pen. Code, § 4500)—to being required to wear wrist and ankle shackles during trial.[2] In addressing the validity of the trial court's action, we noted in *Duran* that limitations on the use of physical restraints on criminal defendants during trial date from the early common law,[3] and that this court had embraced and emphasized the importance of such limitations as early as 1871, when we held in *People v. Harrington* (1871) 42 Cal. 165, 168 (*Harrington*), that "any order or action of the Court which, without evident necessity, imposes physical burdens, pains and restraints upon a prisoner during the progress of his trial, inevitably tends to confuse and embarrass his mental faculties, and thereby materially to abridge and prejudicially affect his constitutional right of defense; and especially would such physical bonds and restraints in like manner materially impair and prejudicially affect his statutory privilege of becoming a competent witness and testifying in his own behalf."

In *Duran*, we proceeded to endorse and restate the teaching of *Harrington*, declaring: "We believe that possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints, as well as the effect such restraints have upon a defendant's decision to take the stand, all support our continued adherence to the *Harrington* rule. We reaffirm the rule that a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints. [Citation.] Numerous cases indicate what circumstances will demonstrate such a need. (See *People v. Kimball* [(1936)] 5 Cal.2d 608, 611 [55 P.2d 483] [defendant expressed intent to escape, threatened to kill witnesses, secreted lead pipe in courtroom]; *People v. Burwell* (1955) 44 Cal.2d 16, 33 [279 P.2d 744] [defendant had written letters stating that he intended to procure a weapon and escape from the

[2]The trial court in *Duran* permitted the defendant to have one hand free to take notes during the trial, but specifically ruled that the defendant's wrists and ankles would be shackled when the defendant testified.

[3]See, for example, 4 Blackstone's Commentaries 322 ("though under an indictment of the highest nature, [the prisoner] must be brought to the bar without irons, or any manner of shackles or bonds, unless there be evident danger of an escape, and then he may be secured with irons"), 2 Hale, Pleas of the Crown 219 ("at this day [prisoners] usually come with their shackles upon their legs, for fear of escape, but stand at bar unbound, till they receive judgment"), and 2 Bishop, New Commentaries on the Law of Pleading and Evidence and the Practice in Criminal Cases (2d ed. 1913) 955 (a defendant should be unshackled in the courtroom so as to have "use of his reason, and all advantages, to clear his innocence").

courtroom with the aid of friends]; . . . ; *People* v. *Hillery* (1967) 65 Cal.2d 795, 806 [56 Cal.Rptr. 280, 423 P.2d 208] [defendant had resisted being brought to court, refused to dress for court, and had to be taken bodily from prison to court]; *People* v. *Burnett* (1967) 251 Cal.App.2d 651, 655 [59 Cal.Rptr. 652] [evidence of escape attempt]; *People* v. *Stabler* (1962) 202 Cal.App.2d 862, 863-863 [21 Cal.Rptr. 120] [defendant attempted to escape from county jail while awaiting trial on other escape charges]; *People* v. *Loomis* (1938) 27 Cal.App.2d 236, 239 [80 P.2d 1012] [defendant repeatedly shouted obscenities in the courtroom, kicked at the counsel table, fought with the officers, and threw himself on the floor].) We further conclude that in any case where physical restraints are used those restraints should be as unobtrusive as possible, although as effective as necessary under the circumstances." (*Duran, supra*, 16 Cal.3d 282, 290-291, fns. omitted.)

In addition to emphasizing that such restraints should not be imposed in the absence of "a showing of *a manifest need* for such restraints" (*Duran, supra*, 16 Cal.3d 282, 291, italics added), in *Duran* we went on to specify how such need should be determined. "The showing of nonconforming behavior in support of the court's determination to impose physical restraints must appear as a matter of record, and, except where the defendant engages in threatening or violent conduct in the presence of the jurors, must otherwise be made out of the jury's presence. The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion. In those instances when visible restraints must be imposed the court shall instruct the jury *sua sponte* that such restraints should have no bearing on the determination of the defendant's guilt. However, when the restraints are concealed from the jury's view, this instruction should not be given unless requested by defendant since it might invite initial attention to the restraints and thus create prejudice which would otherwise be avoided." (*Duran, supra*, 16 Cal.3d at pp. 291-292, fn. omitted.)

In *Duran* we further explained that "[t]he imposition of restraints in a proper case is normally a judicial function in which the prosecutor plays no necessary part. Although the prosecutor may bring to the court's attention matters which bear on the issue, *it is the function of the court*, not the prosecutor, *to initiate whatever procedures the court deems sufficient in order that it might make a due process determination of record that restraints are necessary.* The court's determination, however, when made in accordance with our views herein, cannot be successfully challenged on review except on a showing of a manifest abuse of discretion." (*Duran, supra*, 16 Cal.3d 282, 293, fn. 12, italics added.)

Finally, in *Duran* we considered whether the trial court's shackling of the defendant in that case constituted an abuse of discretion. In analyzing this

question, we stated: "No reasons for shackling the defendant appear on the record. There is no showing that defendant threatened to escape or behaved violently before coming to court or while in court. The fact that defendant was a state prison inmate who had been convicted of robbery and was charged with a violent crime did not, without more, justify the use of physical restraints. As our discussion heretofore indicates, the trial judge must make the decision to use physical restraints on a case-by-case basis. The court cannot adopt a general policy of imposing such restraints upon prison inmates charged with new offenses unless there is a showing of necessity on the record." (*Duran, supra*, 16 Cal.3d 282, 293.) Accordingly, we concluded in *Duran* that the trial court in that case abused its discretion in approving the shackling of the defendant at trial. (*Ibid.*)

■ In applying *Duran* in subsequent cases, this court has explained that "[w]hile no formal hearing as such is necessary to fulfill the mandate of *Duran*, the court is obligated to base its determination on *facts*, not rumor and innuendo even if supplied by the defendant's own attorney." (*People v. Cox* (1991) 53 Cal.3d 618, 651-652 [280 Cal.Rptr. 692, 809 P.2d 351], italics added.) Furthermore, the cases emphasize that a trial court under *Duran* is obligated to make its *own* determination of the "manifest need" for the use of such restraint as a security measure in the particular case, and may not rely solely on the judgment of jail or court security personnel in sanctioning the use of such restraints. As we explained in *People v. Hill* (1998) 17 Cal.4th 800, 841 [72 Cal.Rptr.2d 656, 952 P.2d 673]: "[*Duran's*] emphasis that a showing exist on the record of 'manifest need' for shackles presupposes that it is the trial court, not law enforcement personnel, that must make the decision an accused be physically restrained in the court-room. A trial court abuses its discretion if it abdicates this decision-making authority to security personnel or law enforcement. (*People v. Jackson* (1993) 14 Cal.App.4th 1818, 1825 [18 Cal.Rptr.2d 586] [abuse of discretion to delegate shackling decision to bailiff]; *People v. Jacla* (1978) 77 Cal.App.3d 878, 885 [144 Cal.Rptr. 23] [same].)" (Fn. omitted.) The record must demonstrate that the trial court independently determined on the basis of an on-the-record showing of defendant's nonconforming conduct that "there existed a manifest need to place defendant in restraints." (*Id.* at p. 842.)

2

■ As noted, the initial question before us is whether the legal prin-ciples articulated in *Duran, supra*, 16 Cal.3d 282, that apply to the use of traditional types of physical restraints also apply to the use of a stun belt. In *Garcia, supra*, 56 Cal.App.4th 1349, the Court of Appeal concluded that a

stun belt should not properly be considered a physical restraint within the meaning of *Duran*, because the belt is not seen by the jury and does not restrain the wearer's physical movement and because, in that court's view, the belt "does not diminish courtroom decorum, is less likely to discourage the wearer from testifying, and should not cause confusion, embarrassment or humiliation." (*Garcia, supra*, 56 Cal.App.4th at p. 1356.) Accordingly, the court in *Garcia* held that the rigorous "manifest need" standard imposed in *Duran* was not applicable to the use of a stun belt, and that the use of such a belt instead could be justified under a less demanding "good cause" standard. (*Garcia, supra*, 56 Cal.App.4th at p. 1357.)

The Court of Appeal in the present case reached a contrary conclusion, noting that *Duran* had not limited its holding to visible restraints and finding that the court in *Garcia* improperly had discounted the potential adverse psychological effect that a stun belt might have on a defendant, "stemming from the fear that sudden movement would cause a debilitating electric shock . . . ." Citing numerous instances, reported in case reports and the legal literature, in which a stun belt accidentally had been activated in the past, the Court of Appeal concluded that a defendant reasonably could fear that the stun belt posed an imminent risk of both serious injury and humiliation, that under such circumstances the device properly must be considered a physical restraint within the meaning of *Duran*, and that a trial court's approval of such a device must be governed by the traditional *Duran* standard.

We agree with the Court of Appeal in the present case that *Duran, supra*, 16 Cal.3d 282, properly governs a trial court's decision to compel a defendant in a criminal case to wear a stun belt at trial. As the Court of Appeal accurately noted, the holding in *Duran* clearly was not limited to restraints upon a defendant that are visible to the jury. (See *id.* at p. 292.) Although the court in *Duran* emphasized the adverse effect that visible restraints might have upon a jury, it also relied upon the circumstance—highlighted by this court's early decision in *Harrington, supra*, 42 Cal. 165—that the imposition of such a restraint upon a defendant during a criminal trial "inevitably tends to confuse and embarrass his mental faculties, and thereby materially to abridge and prejudicially affect his constitutional rights of defense . . . ." (*Harrington, supra*, 42 Cal. at p. 168; *Duran, supra*, 16 Cal.3d at p. 288.) Even when the jury is not aware that the defendant has been compelled to wear a stun belt, the presence of the stun belt may preoccupy the defendant's thoughts, make it more difficult for the defendant to focus his or her entire attention on the substance of the court proceedings, and affect his or her demeanor before the jury—especially while on the witness stand. In view of this potential adverse effect, we conclude that before the compelled use of

such a belt can be justified for security purposes, the general standard and procedural requirements set forth in *Duran* must be met.[4]

## C

■ Although the Court of Appeal in this case concluded that the principles set forth in *Duran* apply to the use of a stun belt, that court further determined that the requirements of *Duran* were satisfied in the present case and that the trial court did not abuse its discretion in denying defendant's request to remove the stun belt while he testified. On this point, we disagree with the Court of Appeal.

In finding that the trial court ruling complied with *Duran*, the Court of Appeal stated that "the record contains ample justification for belting defendant during his testimony," relying on the circumstances that defendant "was on trial for assaulting a guard; he had previously been convicted of escape and of assaulting a peace officer; [and] on two recent occasions he had threatened correctional officers and threatened his own defense attorney." The type of circumstances identified by the Court of Appeal, if adequately established on the record and actually relied upon by the trial court, might well support a trial court's determination of manifest need to impose restraints upon a defendant. As we shall explain, however, in this case the security officials who placed the stun belt on defendant made no on-the-record showing of any circumstances to support the imposition of a stun belt on defendant and the trial court failed to require any such showing. Moreover, the record does not demonstrate that the trial court actually determined that defendant posed the type of serious security threat at trial that would justify the imposition of restraints under the "manifest need" standard of *Duran*. Under these circumstances, the imposition of the stun belt on defendant did not satisfy the requirements of *Duran*.

As we have seen, the court in *Duran* explicitly held that "[*t*]*he showing of nonconforming behavior* in support of the court's determination to impose physical restraints *must appear as a matter of record* and, except where the defendant engages in threatening or violent conduct in the presence of the

---

[4] In *United States v. Durham* (11th Cir. 2002) 287 F.3d 1297, the Eleventh Circuit Court of Appeals recently reached a similar conclusion, observing: "[S]tun belts plainly pose many of the same constitutional concerns as do other physical restraints, though in somewhat different ways. Stun belts are less visible than many other restraining devices, and may be less likely to interfere with a defendant's entitlement to the presumption of innocence. However, a stun belt imposes a substantial burden on the ability of a defendant to participate in his own defense and confer with his attorney during a trial. If activated, the device poses a serious threat to the dignity and decorum of the courtroom. [¶] Therefore, *a decision to use a stun belt must be subjected to at least the same 'close judicial scrutiny' required for the imposition of other physical restraints.* [Citation.]" (287 F.3d at p. 1306, italics added.)

jurors, must otherwise be made out of the jury's presence. The imposition of physical restraints in the absence of a record showing of violence or threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*Duran, supra,* 16 Cal.3d 282, 291, italics added.) *Duran* further explained that "it is the function of the court . . . to initiate whatever procedures the court deems sufficient in order that it might make *a due process determination of record* that restraints are necessary." (*Id.* at p. 293, fn. 12, italics added.) Subsequent cases applying *Duran* establish that "[w]hile no formal hearing as such is necessary to fulfill the mandate of *Duran*" (*People v. Cox, supra,* 53 Cal.3d 618, 651-652), when the imposition of restraints is to be based upon conduct of the defendant that occurred outside the presence of the court, sufficient evidence of that conduct must be presented on the record so that the court may make its own determination of the nature and seriousness of the conduct and whether there is a manifest need for such restraints; the court may not simply rely upon the judgment of law enforcement or court security officers or the unsubstantiated comments of others. (See, e.g., *Cox, supra,* 53 Cal.3d at pp. 649-652; *People v. Hill, supra,* 17 Cal.4th 800, 839-842.)[5]

---

[5]In *People v. Cox, supra,* 53 Cal.3d 618, at the outset of a death penalty trial, defense counsel requested an in camera hearing at which counsel stated to the court that " '[i]n our investigation of the case there—we think that there is some possibility that there may be an escape attempt in this case' " and indicated that " 'we're against full shackles but I think there should be some—like a handcuff to a chair I think would be sufficient, so the jury can't see.' " (53 Cal.3d at p. 650.) In response to that statement, the trial court ordered that defendant be handcuffed to his chair. The following day, counsel stated that defendant had indicated that the handcuff was very uncomfortable and counsel requested that it be removed, but the trial court rejected the request. "A day or so later, defendant was brought to court wearing some kind of leg shackles," and when defense counsel inquired about that restraint, the court stated: " 'At least for today, I am going to order that, based on information that has previously been placed on the record in this case, and also based on some information that was imparted to the court today and it is merely by way of rumor. . . .' . . . '[T]he bailiff informed me there were certain rumors floating through the jail today that he was receiving information through other jail personnel that there was going to be an escape, an attempt today; and that's why there is the use of the shackles today. [¶] I don't know that it's anything more than a rumor, but in light of all the information, I felt it was better to be safe than sorry.' " (53 Cal.3d at pp. 650-651.)

On appeal, this court held that "[t]he record before us fails to demonstrate the requisite manifest need" to satisfy the *Duran* standard. (*People v. Cox, supra,* 53 Cal.3d 618, 651.) We explained: "While the instant record may be rife with an undercurrent of tension and charged emotion on all sides, it does not contain a single substantiation of violence or the threat of violence on the part of the accused. Although the shackling decision was not based on a 'general policy' to restrain all persons charged with capital offenses, neither did it follow 'a showing of necessity' for such measures. (See *People v. Duran, supra,* 16 Cal.3d at p. 293.) Accordingly, the trial court abused its discretion in ordering defendant physically restrained in any manner. (*Ibid.*)." (*Cox, supra,* 53 Cal.3d at p. 652.)

In *People v. Hill, supra,* 17 Cal. 4th 800, during one pretrial session in that capital case, the defendant suddenly stood up and walked toward the lockup, saying " 'he had enough of this

The record demonstrates that these procedural prerequisites were not satisfied in the present case. As described above, no security restraints were imposed upon defendant at the outset of trial, and there is nothing in the record to suggest that defendant's conduct during the initial day of testimony—when the two principal prosecution witnesses testified against him—provided any reason to believe that he posed a threat of violence in the courtroom. Neither the bailiff nor jail officials presented any explanation or evidence on the record to support their apparently unilateral decision to require that defendant wear the stun belt on the second day of testimony, when defendant was scheduled to testify on his own behalf. Although the trial court, in its initial response to defendant's objection to the imposition of the stun belt, briefly referred to "an incident, I guess, that happened several . . . well, a month or so ago in the courthouse in the transportation situation, you got crossways with somebody in the security detail," the court immediately acknowledged that "I don't know anything about that other than the fact that something did happen" (apparently not including the circumstance whether the incident involved physical or merely verbal disruption). The trial court never required the security officers to present an on-the-record showing of the specific facts or details of the incident, and no such showing appears in the record. Furthermore, the trial court never made, nor purported to make, a finding or determination that there was a "manifest need" to impose the stun belt upon defendant because he posed a serious security threat in the courtroom. Indeed, there is nothing in the trial court's extended comments—set out at length above—that indicates it was aware that the procedural and substantive requirements established in *Duran* governed its consideration and determination of defendant's objection to the use of the stun belt.

---

shit.' " (*Id.* at p. 839.) At the next court session, defense counsel complained that the defendant improperly had been declared a security risk because of that conduct, and counsel asked the court to find that the defendant was not an escape risk and should be taken off whatever security status he then was on. The court observed that it did not know " 'what precipitated his status of being a security risk' " (*ibid.*, italics omitted), and indicated that although it would have the record reflect that the defendant had simply stood up and had not tried to escape, " 'whether . . . the Sheriff['s Department] is going to change their mind, see, I don't interfere in their business.' " (*Ibid.*, italics omitted.) Thereafter, at the beginning of the trial, defense counsel, noting that the defendant had chains around his legs, asked the court whether it was necessary that he wear those chains. In response, the trial court stated: " 'I believe the [sheriff's] department has said so.' " (*Id.* at p. 840, italics omitted.) The trial court attempted to minimize the visibility of the chains to the jury, but did not order them removed.

On appeal, we held that the trial court's action in permitting the defendant to be shackled at trial was erroneous under *Duran*, explaining that "the record is clear the trial court failed to hold a hearing on, or otherwise determine for itself, whether adequate justification existed to physically restrain defendant in the courtroom. Instead, the trial court deferred to the sheriff's department's decision that shackles were necessary. . . . By failing to determine independently whether, in its view, there existed a manifest need to place defendant in restraints, the trial court abdicated its responsibility and abused its discretion. [Citations.]" (*People v. Hill, supra,* 17 Cal.4th at p. 842.)

On the contrary, the trial court's comments suggest that its rejection of defendant's objection to the use of the stun belt was based at least in significant part upon the court's determination that the use of the belt would be in defendant's best interest because the belt would help defendant control his emotions and not act in a manner that would be detrimental to his case, rather than being premised upon a judicial conclusion that defendant posed a sufficient danger of violent conduct in the courtroom to demonstrate a manifest need for the use of a restraint under *Duran*. Although the trial court undoubtedly had defendant's best interests at heart, even if the use of such a device objectively were in the defendant's best interests the trial court could not compel defendant to wear such a device over objection without the showing and determination required by *Duran*. (Accord, *Faretta v. California* (1975) 422 U.S. 806, 834-835 [95 S.Ct. 2525, 2540-2541, 45 L.Ed.2d 562] [a court may not compel a competent defendant to be represented at trial by counsel rather than to represent himself or herself, even if the court reasonably believes that representation by counsel is in the defendant's best interest].) In this case, the record does not establish that the trial court's decision to compel the use of a stun belt was based upon its determination that there was a manifest need to impose such a restraint for security purposes. In the absence of such a showing and finding, under the principles of *Duran* the trial court could not properly compel defendant to bear the burden of testifying while subjected to a remote-controlled stun belt that defendant objected to wearing. Accordingly, we conclude that the trial court abused its discretion in rejecting defendant's objection to the use of a stun belt.[6]

### D

Further, under the circumstances of the present case, we conclude that the trial court's error in compelling defendant to wear a stun belt during his testimony was prejudicial.

As is revealed by the summary of evidence set forth at the outset of this opinion, it is undisputed that defendant voluntarily surrendered himself to

---

[6]In *Hawkins v. Comparet-Cassani, supra*, 251 F.3d 1230, the Ninth Circuit Court of Appeals reviewed a preliminary injunction issued by a federal district court prohibiting under all circumstances state authorities from using a stun belt on prisoners appearing in Los Angeles County courts. The Ninth Circuit in *Hawkins* concluded that the evidence before the district court supported enjoining the use of a stun belt on criminal defendants who posed a risk of only verbal disruption of court proceedings, but that the injunction was overbroad insofar as it enjoined the use of a stun belt to prevent violence or escape. (251 F.3d at pp. 1239-1242.) The *Hawkins* decision rested solely on federal law and did not purport to determine when the use of a stun belt would be appropriate under California law. Nonetheless, *Hawkins* is consistent with our conclusion that under *Duran*, a stun belt may not properly be used, over a defendant's objection, to deter a defendant from making verbal outbursts that may be detrimental to the defendant's own case.

the custody of the law enforcement officers and also that, once defendant was in the holding cell at the sheriff's department, he became loud and abusive toward Deputy Sheriff Mellon and Sergeant Holm, cursing and making taunting and combative comments directed at both of them. Although the jury certainly was not required to credit the defense's self-serving version of the subsequent events—i.e., that Sergeant Holm actually entered the holding cell in response to defendant's abusive and combative comments in order to quiet him down forcibly, and that it was only after Holm injured his hand while hitting defendant on the head that the officers decided to explain that Holm had opened the cell door pursuant to the officers' decision to move defendant to another cell in order to prevent him from injuring himself—that scenario, at least on its face, was not absurd or inherently implausible. Further, as is reflected in the portion of the transcript quoted above, the trial court (with its opportunity to observe the demeanor of the witnesses) evidently believed that defense counsel's cross-examination of Sergeant Holm was quite effective and demonstrated to the jury "that the situation that occurred on the date in question is not a clear-cut situation." Accordingly, the record indicates that the evidence was not totally one-sided.

Second, the record additionally makes clear that unlike the situation in many other criminal cases, the resolution of this matter turned completely on the jury's evaluation of the credibility of the witnesses, an evaluation that depended in large part upon the demeanor of each witness on the witness stand. Indeed, the trial court, in explaining its ruling on the use of the stun belt, clearly indicated that in its view the quality of defendant's testimony in his own behalf, and in particular his demeanor while testifying, might well be the determining factor as to how the case would be resolved.

From the cold record before us, it is, of course, impossible to determine with any degree of precision what effect the presence of the stun belt had on the substance of defendant's testimony or on his demeanor on the witness stand. But defendant, in objecting to being required to testify while wearing the stun belt, clearly stated that the device made it difficult for him to think clearly and that it added significantly to his anxiety, and the trial transcript confirms that defendant was nervous while testifying at trial. It is, of course, not unusual for a defendant, or any witness, to be nervous while testifying, but in view of the nature of a stun belt and the debilitating and humiliating consequences that such a belt can inflict, it is reasonable to believe that many if not most persons would experience an increase in anxiety if compelled to wear such a belt while testifying at trial. (See, *post*, pp. 1226-1228.) Moreover, defense counsel specifically noted that defendant was "afraid that somebody's going to push the button," and in light of the circumstances that defendant was on trial for having caused an injury to a

law enforcement officer and that the activation of the stun belt was to be controlled by another law enforcement officer, defendant's expressed anxiety in this regard, even if not justified, is plausible. On these facts, it is reasonable to conclude that defendant's being required to wear the stun belt had at least some effect on his demeanor while testifying.

Given the above circumstances—the relative closeness of the evidence, the crucial nature of defendant's demeanor while testifying, and the likelihood that the stun belt had at least some effect on defendant's demeanor while testifying—we determine that even if the prejudicial effect of the trial court's error is evaluated under the *Watson* standard applicable to ordinary state law error (see *People v. Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243] [under the *Watson* "reasonable probability" standard, reversal is required when there exists "at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result"]),[7] there is a reasonable probability that the error affected the outcome of defendant's trial. Accordingly, we conclude that the judgment must be reversed.

## III

As stated at the outset of this opinion, this is the first case in which this court has been called upon to consider the use of the REACT stun belt in criminal trials in California. In addition to addressing the question of the applicability of *Duran*'s "manifest need" standard to the use of such stun belts, we believe it is appropriate, in order to provide guidance both to the trial court in this case—should a question as to the potential use of a stun belt arise on retrial—and to other trial courts that may be faced with a question regarding the use of a stun belt in future trials, to consider a number of distinct features and risks concerning the use of a stun belt that properly

---

[7]Although this court has not addressed the issue directly, a number of Court of Appeal decisions have suggested that at least when the physical restraints imposed upon a defendant are not visible to the jury, trial court error under the *Duran* decision properly is subject to the *Watson* prejudicial error standard. (See, e.g., *People v. Jackson, supra,* 14 Cal.App.4th 1818, 1827-1830; cf. *People v. Tuilaepa* (1992) 4 Cal.4th 569, 583-584 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) None of these decisions, however, involved the improper use of a stun belt, where the greatest danger of prejudice arises from the potential adverse psychological effect of the device upon the defendant rather than from the visibility of the device to the jury. In *United States v. Durham, supra,* 287 F.3d 1297, the Eleventh Circuit recently held that when a trial court without making adequate findings improperly requires a defendant to wear a stun belt, the error is of federal constitutional dimension and " 'reversal is required unless the State proves the error was harmless beyond a reasonable doubt.' " (*Id.* at p. 1308.) Because we conclude that the error in the present case was prejudicial even under the *Watson* standard, we need not determine whether the trial court's error in requiring defendant to testify while wearing a stun belt, without an adequate showing of danger, constituted federal constitutional error that is subject to a more rigorous prejudicial error test.

should be taken into account by a trial court under the *Duran* standard, before compelling a criminal defendant to wear such a device at trial.

As is indicated by this court's opinion in *Duran*, even when the record in an individual case establishes that it is appropriate to impose some restraint upon the defendant as a security measure, a trial court properly must authorize the least obtrusive or restrictive restraint that effectively will serve the specified security purposes. (*Duran, supra,* 16 Cal.3d 282, 291; accord, *Spain v. Rushen* (9th Cir. 1989) 883 F.2d 712.) In recent years, a number of appellate court decisions have suggested that, as a general matter, a stun belt should be viewed as a less restrictive and presumptively less prejudicial security tool than traditional shackles or chains because a stun belt, when worn under a defendant's clothing, is not visible to the jury and, at least as a physical matter, will interfere less with the defendant's freedom of movement than shackles or chains. (See, e.g., *Garcia, supra,* 56 Cal.App.4th 1349, 1356; *Hawkins v. Comparet-Cassani, supra,* 251 F.3d 1230, 1240-1242.) This reasoning would tend to suggest that in most instances in which security measures are warranted, a stun belt properly should be viewed as the security device of choice.

In our view, such an assumption is questionable for a number of reasons.

First, although the use of a stun belt may diminish the likelihood that the jury will be aware that the defendant is under special restraint, it is by no means clear that the use of a stun belt upon any particular defendant will, as a general matter, be less debilitating or detrimental to the defendant's ability fully to participate in his or her defense than would be the use of more traditional devices such as shackles or chains. The psychological effect of wearing a device that at any moment can be activated remotely by a law enforcement officer (intentionally or accidentally), and that will result in a severe electrical shock that promises to be both injurious and humiliating, may vary greatly depending upon the personality and attitude of the particular defendant, and in many instances may impair the defendant's ability to think clearly, concentrate on the testimony, communicate with counsel at trial, and maintain a positive demeanor before the jury. Promotional literature for the REACT stun belt provided by the manufacturer of the belt reportedly champions the ability of the belt to provide law enforcement with " 'total psychological supremacy . . . of potentially troubling prisoners' " (*REACT Security Belt, supra,* 30 St. Mary's L.J. 239, 248, citation omitted), and a trainer employed by the manufacturer has been quoted as stating that " 'at trials, people notice that the defendant will be watching whoever has the monitor.' " (Cusac, *Life in Prison: Stunning Technology: Corrections Cowboys Get a Charge Out of Their New Sci-Fi Weaponry* (July 1996) The

Progressive, p. 20.)[8] Other courts have noted that the psychological effect of a stun belt may affect adversely a defendant's participation in the defense (see, e.g., *Hawkins v. Comparet-Cassani, supra,* 251 F.3d 1230, 1239-1240), and, indeed, the Supreme Court of Indiana recently held that stun belts should not be used in the courtrooms of that state at all, because other forms of restraint "can do the job without inflicting the mental anguish that results from simply wearing the stun belt and the physical pain that results if the belt is activated." (*Wrinkles v. State, supra,* 749 N.E.2d 1179, 1194-1195.)

Because its psychological consequences pose a significant risk of impairing a defendant's ability to participate and assist in his or her defense, a court order compelling a defendant to wear a stun belt at trial over objection bears at least some similarity to the forced administration of antipsychotic medication to a criminal defendant in advance of, and during, trial. In considering the constitutional validity of such forced administration in *Riggins v. Nevada* (1992) 504 U.S. 127 [112 S.Ct. 1810, 118 L.Ed.2d 479], the United States Supreme Court took note of "the possibility that the substance of [the defendant's] own testimony, his interaction with counsel, or his comprehension at trial were compromised by the forced administration of [the antipsychotic medication]" (*id.* at p. 138 [112 S.Ct. at p. 1816]). The high court further observed that " '[w]hile the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects.' " (*Id.* at p. 134 [112 S.Ct. at p. 1814], quoting *Washington v. Harper* (1990) 494 U.S. 210, 229 [110 S.Ct. 1028, 1041, 108 L.Ed.2d 178].) In analyzing whether the involuntary administration of such drugs in the case before it affected the validity of the defendant's conviction, the high court in *Riggins* observed that such involuntary administration would have been permissible "if the prosecution had demonstrated, and [the trial court] had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others. [Citations.] Similarly, the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means." (*Riggins,* at p. 135 [112 S.Ct. at p. 1815].) In the

---

[8]Another magazine article, in describing the manufacturer's promotional materials, reports that "[o]ne of the great advantages [of the stun belt], the company says, is its capacity to humiliate the wearer. 'After all, if you were wearing a contraption around your waist that by the mere push of a button in someone else's hand could make you defecate or urinate yourself,' the brochure asks, 'what would that do to you from the psychological standpoint?' " (Schulz, *Cruel and Unusual Punishment* (Apr. 24, 1997) N.Y. Review of Books, p. 51 (Schulz).)

*Riggins* case, however, the high court concluded that due process principles required reversal of the defendant's conviction, because the trial court had "failed to make findings adequate to support forced administration of the drug." (*Id.* at p. 129 [112 S.Ct. at p. 1812].)

There are, of course, obvious distinctions between the compelled use of a stun belt and the involuntary administration of antipsychotic drugs at issue in *Riggins*. Unlike the administration of antipsychotic drugs, the use of a stun belt is not claimed to be medically appropriate or medically therapeutic for the defendant. At the same time, the medical or psychological risks posed by the involuntary use of a stun belt are not as well established or well documented as those associated with the use of antipsychotic drugs. Nonetheless, the two situations do raise some of the same concerns—concerns that arise from the circumstance that the state's intervention may result in the impairment, mental or psychological, of a criminal defendant's ability to conduct a defense at trial.

In view of the potentially significant psychological effects of the use of a stun belt, we believe that any presumption that the use of a stun belt is always, or even generally, less onerous or less restrictive than the use of more traditional security measures is unwarranted. Instead, we determine that a trial court must take into consideration the potential adverse psychological consequences that may accompany the compelled use of a stun belt and should give considerable weight to the defendant's perspective in determining whether traditional security measures—such as chains or leg braces—or instead a stun belt constitutes the less intrusive or restrictive alternative for purposes of the *Duran* standard.

Second, in addition to the potential adverse effect that a properly functioning stun belt may have upon a defendant's ability to participate in his or her defense, a number of newspaper and magazine articles have reported a disturbing number of accidental activations of the REACT stun belt. Although we have not found any recent publications that provide the precise number of accidental activations to date, an April 1997 article in the Los Angeles Times reported that a spokeswoman for the manufacturer of the REACT belt stated that, as of that date, the REACT belt had been unintentionally activated on nine occasions. (Tamaki, *Concerns Over Jail Stun Guns Spark Debate*, L.A. Times (Valley ed. Apr. 2, 1997) p. B3; see also Hudac, *Shocking Restraint*, Cleveland Plain Dealer (Dec. 25, 1996) p. B7 [Stun Tech president reports nine unintentional activations]; *REACT Security Belt, supra*, 30 St. Mary's L.J. 239, 289 [reporting nine accidental activations].) An

accidental activation of a stun belt occurred in a California case that currently is pending before our court,[9] and similar accidental activations in at least one other trial in California and in proceedings in Idaho, Nevada, Ohio, and Texas have been noted in judicial decisions. (See *Hawkins v. Comparet-Cassani, supra,* 251 F.3d 1230, 1235; *State v. Wachholtz* (1998) 131 Idaho 74 [952 P.2d 396, 398]; *Hollaway v. State* (2000) 116 Nev. 732 [6 P.3d 987, 993]; *State v. Filiaggi* (1999) 86 Ohio St.3d 230 [714 N.E.2d 867]; *Chavez v. Cockrell* (N.D.Tex. 2001) 2001 WL 1609347.) In light of the substantial physical harm that may result when the device is activated, any significant doubt as to the reliability of the stun belt renders even more suspect the general assumption that a stun belt is a less onerous or restrictive alternative to traditional security measures. Certainly the risk of accidental activation is one that should be considered by the trial court, and should be brought to the attention of any defendant who is asked to express a preference regarding the use of such a stun belt over a more traditional security restraint.

Third, the manufacturer of the REACT stun belt and regular users of the device apparently recognize that the stun belt poses special danger when utilized on persons with particular medical conditions, such as serious heart problems. (Welsh, *Electroshock Torture and the Spread of Stun Technology, supra,* 349 The Lancet 1247; see also Schulz, *supra,* N.Y. Review of Books at p. 53 [quoting statement of the Assistant Director of the Federal Bureau of Prisons indicating the bureau's policy not to use stun belts on " '1) pregnant female inmates, 2) inmates with heart disease, 3) inmates with multiple sclerosis, 4) inmates with muscular dystrophy, and 5) inmates who are epileptic' "].) Despite these significant medical risks, we are unaware of any formal procedural safeguards that have been established to ensure that the medical records of defendants for whom the use of a stun belt is recommended have been thoroughly reviewed and, if necessary, that such persons are provided with an adequate medical examination, prior to use of the belt. Particularly when the risk of accidental activation is considered, use of a stun belt without adequate medical precautions is clearly unacceptable.

Fourth, and finally, in determining whether the REACT stun belt constitutes the least restrictive security measure, it appears that minimal consideration has been given to whether the current design of the belt—delivering a 50,000-volt shock lasting 8 to 10 seconds, that cannot be lowered in voltage or shortened in duration—is necessary to achieve the court's legitimate security objectives, or whether instead a different design, perhaps delivering a much lower initial shock and equipped with an automatic cutoff switch, is

---

[9]The record in *People v. Hill,* review granted July 18, 2001, S097429, indicates that during a criminal trial held in Alameda County in July 1998, a stun belt accidentally activated, resulting in the defendant's hospitalization.

feasible and would provide adequate protection. We believe that a trial court's assessment of whether the stun belt proposed for use in a particular case is the least restrictive device that will serve the court's security interest must include a careful evaluation of this design choice.

In sum, the compelled use of a stun belt as a security measure in a criminal trial, over a defendant's objection, raises significant questions that generally have not been addressed by trial courts asked to approve the use of this relatively novel type of security device. Before a trial court approves the use of such a device in the future, the court must consider the foregoing factors and may approve the use of a stun belt only if it determines that the use of the belt is safe and appropriate under the particular circumstances.

## IV

As explained above, we conclude that the trial court erred in compelling defendant to wear a stun belt while testifying at trial, and that the error was prejudicial in this case. Accordingly, the judgment of the Court of Appeal, upholding the conviction, is reversed and the matter is remanded to the Court of Appeal with directions to remand the matter to the superior court for a new trial.

Kennard, J., Werdegar, J., Chin, J., Moreno, J., and O'Rourke, J.,* concurred.

**BROWN, J.**—I strongly disagree.

1.  The Court of Appeal got it right in *People v. Garcia* (1997) 56 Cal.App.4th 1349 [66 Cal.Rptr.2d 350]. The rules governing the use of physical restraints during trial, set forth in *People v. Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1] (*Duran*), should not apply to the use of a stun belt.

In *Duran*, this court announced the rule that a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints. (*Duran, supra,* 16 Cal.3d at pp. 290-291.) Four grounds were given for the rule: possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect to the judicial system, and the effect such restraints have upon a defendant's decision to take the stand. (*Id.* at p. 290.) The first of the four grounds—possible prejudice in the minds of the

---

*Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.

jury—was unquestionably the most salient. "The guidelines imposed by *People* v. *Duran, supra,* 16 Cal.3d 282, 290, are intended, in large part, to avoid prejudice in the minds of jurors where a defendant appears or testifies in obvious restraints, or where the restraints deter him from taking the stand in his own behalf." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) " 'We have consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury. [Citations.]' (*People v. Tuilaepa,* [*supra,*] 4 Cal.4th [at pp.] 583-584 . . . .) Even a jury's brief observations of physical restraints generally have been found nonprejudicial. (*People v. Duran, supra,* 16 Cal.3d 282, 287, fn. 2; *People v. Tuilaepa, supra,* 4 Cal.4th at p. 584; *People v. Rich* (1988) 45 Cal.3d 1036 [248 Cal.Rptr. 510, 755 P.2d 960].)" (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1213 [120 Cal.Rptr.2d 477, 47 P.3d 262].)

When a stun belt is used as it is designed to be used, as it was here, it is not observable by the jury. Therefore, since use of a stun belt can entirely avoid the problem the *Duran* court was most concerned to minimize—prejudicing jurors—use of a stun belt should not be governed by the *Duran* rule.

2.   According to the majority, "the trial court's comments suggest that its rejection of defendant's objection to the use of the stun belt was based at least in significant part upon the court's determination that the use of the belt would be in defendant's best interest because the belt would help defendant control his emotions and not act in a manner that would be detrimental to his case, rather than being premised upon a judicial conclusion that defendant posed a sufficient danger of violent conduct in the courtroom to demonstrate a manifest need for the use of a restraint under *Duran*." (Maj. opn., *ante,* at p. 1223.)

To the contrary, the judge earlier clearly indicated he was concerned about defendant's "tendency to engage in violent conduct." Indeed, who would not have been? Defendant was on trial for assaulting a peace officer, and he had previously been convicted for escape and assaulting a peace officer. Moreover, he was mentally unstable. His own counsel earlier argued that defendant was incompetent, that he was incapable of having rational conversations with counsel, that his behavior was "explosive," and that he was psychotic. In explaining to defendant his decision to authorize use of a stun belt, the trial judge could have catalogued defendant's acts of violence and instances of mental instability, but that would have been waving a red flag at him, possibly provoking the very behavior that everyone was at pains to prevent or control, so the judge wisely explained his decision to defendant in

soothing terms, pointing out to him that it was in his own interest that he be inhibited from losing his temper in front of the jury. The trial judge can be criticized for failing to put his concerns fully on the record, but he should not be chastised for handling the defendant with kid gloves.

3. Assuming for the sake of argument only that use of the stun belt was error, the error has not been shown to be prejudicial. On the one hand, the majority claims that "the trial transcript confirms that defendant was nervous while testifying at trial." (Maj. opn., *ante*, at p. 1224.) On the other hand, the majority admits that "It is not explicitly apparent from the transcript of the proceedings what effect the stun belt had on the content of defendant's testimony or on his demeanor while testifying." (Maj. opn., *ante*, at p. 1213.) Then, lamely, the majority continues: "The transcript does reflect, however, that on a number of occasions during his testimony, defendant became excited and apparently spoke very rapidly." (*Ibid.*) So what? As the majority admits, speaking in public, much less testifying in court, makes many people nervous, especially if they haven't done it before. Indeed, that was the explanation for his rapid speech that his counsel elicited from defendant. (*Ibid.*) Speaking rapidly was apparently defendant's ordinary speech pattern, inside of court and out, for long before defendant went on trial, and long before he was wearing a stun belt, defense counsel characterized him as "*eruptive with speech.*" (Italics added.) It is difficult to believe that my colleagues have actually read defendant's testimony, for the only thing that is remarkable about it is how unremarkable it is. For nearly 100 pages, defendant doggedly, and seemingly unperturbably, sticks with the old *I feigned a mental breakdown in order to get myself arrested so I could get brownie points with my parole officer for turning myself in* story.

4. As for part III of the majority opinion, courtroom security is a serious business. Were this court to take it seriously, one would hope, with the resources available to us, we could find a better means of informing ourselves than by relying on such secondary sources as a *student comment* in a law journal (maj. opn., *ante*, at pp. 1215, 1226-1227, 1228) and a Progressive magazine article that bares its heart in its subtitle—*Stunning Technology: Corrections Cowboys Get a Charge Out of Their New Sci-Fi Weaponry* (maj. opn, *ante*, at pp. 1226-1227).[1] A high school student who turned in a research paper with a bibliography like that would be unlikely to get high marks for either the distinction or balance of the authorities cited.

---

[1]On its Web site, The Progressive describes its mission as follows: "The magazine, its affiliates, and its staff steadfastly oppose militarism, the concentration of power in corporate hands, the disenfranchisement of the citizenry, poverty, and prejudice in all its guises. We champion peace, social and economic justice, civil rights, civil liberties, human rights, a preserved environment, and a reinvigorated democracy." (<http:/www.progressive.org/aboutus.html> [as of Aug. 22, 2002].)

We are a court of review. The question for review here was whether the judgment of conviction must be overturned because defendant was required to wear a stun belt, and the answer is, we should have affirmed the judgment because no prejudice was shown. Full stop. The question in this case was not whether stun belts pose serious medical risks for persons with heart problems or other medical conditions, nor was it whether the current design of the stun belt could be improved upon. There is absolutely no evidence in the record bearing on these questions. In the absence of such evidence, we had two choices. We could have deferred to the Legislature, which can make law after hearing from distinguished experts on all sides of controversial issues. Or we could have waited for a case that raised these questions on an adequate record. Instead, the majority, rushing to judgment after conducting an embarrassing Google.com search for information outside the record, has tied the hands of the Legislature, to the likely peril of judges, bailiffs, and ordinary citizens called upon to do their civic duty.

On September 11, 2002, the opinion was modified to read as printed above.