Filed 10/7/15  P. v. Padilla CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>MELISSA LOUISE PADILLA,<br><br>　　　Defendant and Appellant. | D066128<br><br><br><br>(Super. Ct. No. SCE338244) |

APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed.

John Derrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

Melissa Louise Padilla appeals a judgment following her jury convictions of one count of elder abuse under circumstances likely to produce great bodily harm (Pen. Code,

§ 368, subd. (b)(1)),[1] one count of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), and one count of assault with a deadly weapon (§ 245, subd. (a)(1)). On appeal, she contends: (1) because the evidence is insufficient to support a finding she committed elder abuse under circumstances likely to produce great bodily harm or death, the trial court erred by denying her section 1118.1 motion for judgment of acquittal on the section 368, subdivision (b)(1), charge against her; (2) the court prejudicially erred by ordering her to be physically restrained while testifying without any manifest need to do so; and (3) the court improperly penalized her for exercising her constitutional right to a jury trial by imposing a greater sentence on her than it indicated it would before trial.

FACTUAL AND PROCEDURAL BACKGROUND

In 2014, Padilla lived in a home in Santee with Beverly Cunningham (her grandmother), Brent Cunningham (her uncle), Edwin Cunningham (her uncle), and her two children. At about 12:30 a.m. on February 23, Padilla was sitting outside on a chair on the patio with her daughter asleep on her lap. Padilla had been drinking alcohol on the patio that evening. Brent had just returned home from work. Beverly went outside to wake up Padilla. When Beverly tapped her on the arm, Padilla told her, "F you, waking me up." Beverly told Padilla to bring her daughter inside the house. After about 30 seconds of arguing, Padilla slapped Beverly on the arm and pushed her backwards. Beverly stumbled backwards, but regained her balance. Padilla pushed her a second

_____

1    All statutory references are to the Penal Code.

2

time.  Padilla then took her daughter inside the house and locked Beverly outside.  Beverly was locked outside between 30 seconds and five minutes until Brent let her in the house.

Inside the house, Padilla and Beverly continued arguing.  Padilla was screaming, using profanity, and calling Beverly "nasty" names.  When Beverly told Padilla to stop because her daughter was scared and crying, Padilla placed both of her hands around Beverly's throat and started choking her.  Beverly gasped for breath and was "really, really scared."  After less than a minute, Brent came and tried to pull Padilla off Beverly.  Brent hit Padilla in the jaw with his fist to get her to let Beverly go.  Padilla then grabbed a child's gate and hit Brent in the right temple with it, causing him to bleed from his right temple.

Beverly called 911 to report the incident.  She reported that "[s]he [i.e., Padilla] just got me around the neck and was choking me."  About that time, Edwin (also known as Doug) woke up.  He was recovering from a stroke and diabetic attack, and used a walker.  He went to the kitchen and saw Beverly was crying hysterically and had red marks around her neck.  Edwin asked Padilla, "What the hell is wrong with you?"  He and Padilla argued for about five minutes.  Padilla was screaming, cussing, and calling him names.

Beverly called 911 a second time.  Padilla tried to grab the telephone out of Beverly's hand.  Padilla yelled for help, screaming that Edwin would not let her out of the house.  She cursed at Edwin and pushed him to the floor.  She grabbed a meat cleaver and was threatening him with it while he lay on the floor.  She opened the front door and

3

screamed, "Let the whole damn world see this." She then approached Edwin, who was still on the floor, and swung the meat cleaver at him, coming within two feet of him. Edwin grabbed her wrist.

San Diego Deputy Sheriff Troy Udvarhelyi arrived at the home and heard screaming and commotion. He could see through the open front door into the kitchen. Padilla was holding a meat cleaver inches from Edwin's head, and Edwin was trying to push her away. San Diego Deputy Sheriff Felipe Guths also arrived at the scene and saw Padilla holding a knife above her head. Udvarhelyi repeatedly told Padilla to drop the cleaver. After five to 10 seconds, she dropped it. She appeared intoxicated and smelled of alcohol. She was rambling and screaming random statements. Although Beverly sustained injuries to her arm and wrist, she apparently did not have any injuries on her neck.

An information charged Padilla with one count of elder abuse under circumstances likely to produce great bodily harm (§ 368, subd. (b)(1)), one count of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), and one count of assault with a deadly weapon (§ 245, subd. (a)(1)). It also alleged that in committing count 3, she used a deadly or dangerous weapon (i.e., a cleaver) within the meaning of section 1192.7, subdivision (c)(23).

At trial, the prosecution presented the testimonies of Beverly, Brent, Edwin, Udvarhelyi, and Guths substantially as described above. The prosecution also presented evidence of a prior incident in 2005 during which Padilla grabbed Beverly's hair and pulled her down on the floor. She choked Beverly, saying "I'm going to kill the bitch."

4

Brent told her to let Beverly go and punched Padilla in the face. Beverly sustained red and purple marks on her throat and bruises on her arm. Padilla pleaded guilty to a charge of battery against Beverly.

Padilla testified in her defense. She stopped drinking alcohol at about 9:30 or 10:00 p.m. that evening. She was screaming to herself about what a jerk her ex-husband was. Beverly came out and asked Padilla at whom was she yelling. She told Beverly to "[g]et out my face [and] stop nagging me." Padilla walked inside the house, but did not lock Beverly outside. Brent pushed or punched her and she "went out." When she "came to," Brent was on top of her and she palmed him in the face to get him off of her. She remembered being pushed against the refrigerator. Edwin had his hands around her throat, choking her, and she had a meat cleaver in her hand. When deputies arrived and told her to drop the cleaver, it was by her side and not above her head.

The jury found Padilla guilty of all three charged offenses. The trial court sentenced her to a total of six years in prison. Padilla timely filed a notice of appeal.

DISCUSSION

I

*Denial of Section 1118.1 Motion*

Padilla contends the trial court erred by denying her section 1118.1 motion for judgment of acquittal on the section 368, subdivision (b)(1), charge because the evidence presented by the prosecutor was insufficient to support a finding that she committed elder abuse under circumstances likely to produce great bodily harm. She argues the evidence

5

did not support a finding that it was likely great bodily harm would be produced when she placed her hands around Beverly's throat.

## A

A defendant's motion for judgment of acquittal must be granted "if the evidence . . . before the court is insufficient to sustain a conviction of such offense or offenses on appeal." (§ 1118.1.) "An appellate court reviews the denial of a section 1118.1 motion under the standard employed in reviewing the sufficiency of the evidence to support a conviction." (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) In so doing, we focus only on the evidence admitted at the time the motion is made. (*Ibid.*)

Generally, when addressing a claim of insufficiency of the evidence, our task "is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

The substantial evidence standard of review involves two steps. "First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences. [Citation.] Second, one must determine

6

whether the evidence thus marshaled is substantial. While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . [Citation.] '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633, fns. omitted.) The standard of review is the same in cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932.)

Section 368, subdivision (b)(1), provides that "[a]ny person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any elder or dependent adult to suffer, or inflicts unjustifiable physical pain or mental suffering" is punishable by imprisonment in county jail for up to one year and/or a fine up to $6,000, or in state prison for two, three, or four years. Great bodily injury or harm has been defined as an "injury which is significant or substantial, not insignificant, trivial or moderate." (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.) For a section 368, subdivision (b)(1), offense to occur, *actual* harm or injury is *not* required. (*Roman v. Superior Court* (2003) 113 Cal.App.4th 27, 35.) Although "likely" often

7

means probable or more likely than not, it also can mean a substantial danger or a serious and well-founded risk. (*People v. Wilson* (2006) 138 Cal.App.4th 1197, 1201-1204; *People v. Russell* (2005) 129 Cal.App.4th 776, 787.) To convict a defendant of elder abuse, the jury is not required to unanimously agree on one circumstance or condition likely to produce great bodily harm or death. (*People v. Racy* (2007) 148 Cal.App.4th 1327, 1334.)

B

Based on our review of the record, we conclude the prosecution presented sufficient evidence at the time of Padilla's section 1118.1 motion to have supported a finding by the jury that she committed elder abuse "under circumstances or conditions likely to produce great bodily harm or death." (§ 368, subd. (b)(1).) The jury could have reasonably found that when Padilla angrily placed her hands around Beverly's throat and began choking her, it was likely her actions would produce great bodily harm or death. At the time of trial, Beverly was 79 years old. As Padilla choked Beverly for less than one minute, Beverly gasped for breath and was really scared. The jury could reasonably infer Padilla's actions in choking Beverly were likely to produce great bodily harm or death.

The fact Beverly did not actually suffer any great bodily injury did not preclude a finding Padilla's actions were *likely* to produce great bodily harm or death. Rather, the jury could reasonably find Padilla's actions posed a substantial danger or a serious and well-founded risk to Beverly of great bodily harm or death. (*People v. Wilson*, *supra*, 138 Cal.App.4th at pp. 1201-1204; *People v. Russell*, *supra*, 129 Cal.App.4th at p. 787.)

8

Because there was substantial evidence to support a finding by the jury that Padilla's elder abuse was committed "under circumstances or conditions likely to produce great bodily harm or death," the trial court properly denied Padilla's section 1118.1 motion for acquittal of the section 368, subdivision (b)(1), charge against her. To the extent Padilla cites other evidence or inferences therefrom to support a contrary finding, she misconstrues and/or misapplies the substantial evidence standard of review that we apply in reviewing the denial of a section 1118.1 motion.

## II

### *Trial Court's Order for Physical Restraint of Padilla*

Padilla contends the trial court prejudicially erred by ordering she be physically restrained while testifying without any manifest need for restraint.

### A

During trial, the trial court raised the issue of restraining Padilla if she chose to testify either with shackling or the immediate presence of a bailiff. The court expressed concerns based on the configuration of its courtroom (i.e., the close proximity of the witness stand to the jury box). The court stated:

> "[W]hat I have in the [witness stand] is an o-ring on the floor under the desk to which she can be shackled which is not visible from the jury box. I've sat in seats one and seven, it's not visible. If she is shackled to that, the bailiff need not accompany her. The jury is not present when she's placed in the jury box. She's able to stand and still not be visible so she can show her respects to the jury. At the end of her testimony, then we recess, the jury is then excused, the windows are blocked and she's released. *Because of the nature of the charges—any defendant*. I just have a problem with the proximity of the jury.

9

"Your choices are, one, to secure her in that fashion. I will give you an opportunity to examine it if you want to see how visible. I have done it before and it works. Or, to have the bailiff accompany her to the [witness stand]. I'm not going to let her go up there unaccompanied." (Italics added.)

Padilla's counsel objected to both alternatives for restraint, but the court replied either her counsel would pick one or it would pick one. The court stated those security measures would not have been necessary if Padilla was out of custody. The court explained:

"The fact remains she's in custody. She's charged with three crimes of violence and . . . I have done it before, [testifying defendants are] three to five feet away from the jury and I will not allow it. I have done it in such a way that it does not disclose her custody status. I assume you want the latter. When there's a recess, you can examine it [i.e., the witness stand].

The court later explained:

"In chambers, I mentioned what I consider the procedure if she chooses to testify. Ordinarily, in the past, the bailiff would accompany her to the witness stand and hover. The appellate courts have indicated their displeasure with that process. But they, at least in the TV shows I watch in other courtrooms, the witness stand is on the opposite side of the courtroom from the jury box. That is not the case in this courtroom. The jury box is maybe five feet away and *the defendant is in custody. She's charged with a felony. I'm not going to make any specific finding of her propensity to commit violence or whatever. I'm not convince*[d] *I need to*.

"The choices are: The [witness stand] is equipped with an o-ring hidden under the desk to which she would be attached. I have checked from the number one and number seven jury seats and that is not visible and it does allow her to stand to show her respect when the jury enters." (Italics added.)

The court stated: "I emphasize, *it's not directed to this particular defendant*." (Italics added.) The court then had the bailiff conduct a "dry run" by placing Padilla on the witness stand to determine whether the restraint on her would be visible from the jury

10

box.  Padilla's counsel stated that although he could not see the o-ring, he could see the chain and the "thing" around Padilla's ankle.  The court then directed the bailiff to shorten the chain, so Padilla's foot would be hidden farther under the desk.  The court further noted Padilla could keep her foot under the desk "to minimize any visibility."

After the prosecution rested its case, the trial court revisited the issue of restraining Padilla, stating:

> "I want the record to reflect that [during a recess] the Court went over and sat in the number 7 juror seat and could see, if it looked intentionally, if it looked into the [witness stand], it could see the securing of the defendant, but it was difficult to do so.  However, . . . that is controlled by the defendant.  If she simply moves her leg forward, it can't be viewed.  That's up to her.  I wanted to put on the record that there's a lot of room for her to move the cord.  There's no restraint for her to move it forward, even in the standing position, she can keep that foot forward."

Padilla later testified in her defense, presumably with the physical restraint described by the trial court.

B

"[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints."  (*People v. Duran* (1976) 16 Cal.3d 282, 290-291, fn. omitted (*Duran*).)  A "manifest need" for restraints is shown when a defendant has been unruly, announced an intention to escape, or when the evidence shows the defendant would likely disrupt the judicial process.  (*People v. Wallace* (2008) 44 Cal.4th 1032, 1050; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1031-1032; *People v. Seaton* (2001) 26 Cal.4th 598, 651.)  It is an abuse of a trial court's discretion to impose physical restraints in the absence of a

11

showing on the record of violence or threat of violence or other nonconforming conduct. (*Wallace*, at p. 1050; *Lewis and Oliver*, at p. 1032; *Seaton*, at p. 651.) "[T]he trial judge must make the decision to use physical restraints on a case-by-case basis. The court cannot adopt a general policy of imposing such restraints upon prison inmates charged with new offenses [or other defendants] unless there is a showing of necessity on the record." (*Duran*, at p. 293.) Furthermore, a court cannot justify the use of restraints based solely on the layout of the courtroom and/or the fact the defendant has been charged with a violent crime. (*Seaton*, at p. 652.)

The due process clause of the United States Constitution prohibits the use of *visible* shackles unless they are justified by an essential state interest (e.g., courtroom security) specific to the defendant. (*Deck v. Missouri* (2005) 544 U.S. 622, 624, 632; *People v. McDaniel* (2008) 159 Cal.App.4th 736, 742.) If a trial court requires a defendant to wear shackles that will be *seen* by the jury without adequate justification, it is federal constitutional error unless the People prove beyond a reasonable doubt the error did not contribute to the verdict. (*Deck*, at p. 635; *McDaniel*, at p. 742; *Chapman v. California* (1967) 386 U.S. 18, 24.) In contrast, if a trial court orders a defendant to be restrained without a showing of manifest need for such restraints but the record does not affirmatively show the jury saw the restraints, the error is subject to the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (i.e., the error is harmless unless the defendant shows it is reasonably probable he or she would have obtained a more favorable verdict in the absence of visible restraints). (*People v. Jackson* (1993) 14 Cal.App.4th 1818, 1829 (*Jackson*).) The California Supreme Court has "consistently

12

held that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his [or her] defense."  (*People v. Anderson* (2001) 25 Cal.4th 543, 596; see also *People v. Tuilaepa* (1992) 4 Cal.4th 569, 583-584.)

C

Based on our review of the record, we conclude the trial court abused its discretion by ordering that Padilla be restrained during her testimony without a showing of manifest need for such restraint.  The court made its decision to restrain Padilla based on the close proximity of the witness stand to the jury box and the fact she was charged with a violent crime and/or was an inmate.  The court explained its basis for imposing the restraint requirement, stating it was "[b]ecause of the nature of the charges—any defendant.  I just have a problem with the proximity of the jury."  The court did not receive or consider any information that Padilla posed a risk of violent or unruly conduct in court or had threatened to escape.  By apparently applying a general policy of restraining all defendants charged with violent crimes regardless of showing of a manifest need that the particular defendant be restrained, the court erred.  "[T]he trial judge must make the decision to use physical restraints on a case-by-case basis.  The court cannot adopt a general policy of imposing such restraints upon prison inmates charged with new offenses [or other defendants] unless there is a showing of necessity on the record."  (*Duran*, *supra*, 16 Cal.3d at p. 293.)

The court in this case apparently believed it was not required to consider whether there was a manifest need for Padilla to be restrained, stating: "*I'm not going to make any*

13

*specific finding of her propensity to commit violence or whatever. I'm not convince*[*d*] *I need to*." (Italics added.) We hold that a trial court needs to make a specific finding that there is a showing of manifest need for restraining a particular defendant (e.g., information showing a defendant poses a significant risk of violent conduct in the courtroom) before it can order that defendant to be restrained. (*Duran*, *supra*, 16 Cal.3d at pp. 290-291; *People v. Wallace*, *supra*, 44 Cal.4th at p. 1050; *People v. Lewis and Oliver*, *supra*, 39 Cal.4th at pp. 1031-1032; *People v. Seaton*, *supra*, 26 Cal.4th at p. 651.)

D

Although the trial court abused its discretion by ordering that Padilla be restrained without considering whether there was a manifest need for such restraint, we nevertheless conclude that error was not prejudicial under the *Watson* standard. Contrary to Padilla's assertion, because the record does *not* affirmatively show the jurors saw Padilla's restraints, we conclude there was no federal constitutional error requiring the application of the more stringent *Chapman* standard of prejudicial error. (*Jackson*, *supra*, 14 Cal.App.4th at p. 1829.) Instead, the record shows there was, at most, a *possibility* jurors could have seen her restraints. Furthermore, it was possible for jurors to have seen the restraints only if she did not keep her foot forward and the attached chain or cord adequately hidden or obscured by the witness stand's desk. Therefore, because the record does not affirmatively show her restraints were seen by the jury, the court's error did not violate her federal constitutional rights. (*Deck v. Missouri*, *supra*, 544 U.S. at p. 635; *Jackson*, at p. 1829.)

14

Under the California standard of prejudicial error, it has been "consistently held that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his [or her] defense." (*People v. Anderson*, *supra*, 25 Cal.4th at p. 596; see also *People v. Tuilaepa*, *supra*, 4 Cal.4th at pp. 583-584.) In this case, as discussed above, there is no evidence the jury actually saw Padilla's restraints. Likewise, contrary to Padilla's assertion, there is no evidence showing her right to testify or participate in her defense was prejudiced. Padilla was restrained only when she was on the witness stand. She, at most, speculates the hidden leg restraint resulted in psychological effects that impaired her testimony or demeanor while on the witness stand. However, it cannot be reasonably inferred from the record that either her testimony or demeanor was adversely affected by that restraint. *People v. Mar* (2002) 28 Cal.4th 1201, cited by Padilla, involved a powerful electronic stun belt worn by the defendant during his testimony and therefore is factually inapposite to this case and does not persuade us to reach a contrary conclusion. Based on our review of the record, we conclude it is not reasonably probable Padilla would have obtained a more favorable verdict had she not been restrained during her testimony. (*Jackson*, *supra*, 14 Cal.App.4th at p. 1829; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) The court's error in ordering that she be physically restrained during her testimony was not prejudicial.

III

*Imposition of Sentence Greater Than Indicated Before Trial*

Padilla contends the court improperly penalized her for exercising her constitutional right to a jury trial by imposing a greater sentence on her than it indicated it would before trial. She argues that because there was no new information the court obtained during trial or at sentencing that could have supported a greater sentence, the court must have wrongly penalized her for going to trial.

A

The prosecution's trial brief represented that Padilla had one prior felony conviction (i.e., a § 496, subd. (a), conviction for receiving stolen property). It also briefly described the events of the instant incident.

At the pretrial hearing on in limine motions, the trial court raised the issue of plea negotiations between the parties. The court stated:

> "I don't know what the People are offering in this case, but the court indicated its inclination that *if she* [Padilla] *were to plead to the charges*—they're currently not willing to make a plea agreement, but if she were willing to plead to the charges, at the time of sentencing, I would reduce counts 2 and 3 to misdemeanors, count 3 being the most significant because it is a serious felony and a strike. She would still face a felony charge on count 1 and *the court has indicated its inclination to grant her probation.*

> "You asked in chambers for the court to commit itself to a 180 day maximum sentence and local time. As I have reconsidered—the reason I'm not willing to do that, it may well end up that way. I don't know what her credits are, it may end up that way. The reason I'm not willing to do that is *I don't know until I see the probation report what her attitude is going to be.* If she goes to the probation and says 'This is a bunch [of] bull. This never happened. This is ridiculous.' If she has an attitude problem, then I'm not going to be

16

bound. It's that simple. That's where we stand. I assume you conveyed all of that except maybe those last comments?" (Italics added.)

The court continued: "My inclination is if she goes up there with a little bit of humility and a little bit of humbleness never hurt anybody. But if I detect a certain amount of denial? Arrogance? I don't know. But that would make the difference. *That's why I'm not willing to commit to the 180 days, but I'm willing to commit to the grant of probation*." (Italics added.) The court then asked Padilla whether she understood what it was saying. Padilla replied, "Uh-huh. I'm not pleading."

After trial, the probation report stated Padilla was presumptively ineligible for probation pursuant to section 1203, subdivision (e)(4), because she had three prior felony convictions. It further stated there was nothing unusual in this case to overcome that presumption. It cited three factors supporting a denial of probation: (1) Padilla was armed with a weapon (i.e., a metal baby gate and a meat cleaver); (2) she inflicted personal injury on her grandmother and uncle; and (3) she had not expressed remorse for the instant offense. It stated the probation officer had "considered making a recommendation for 365 days in local custody followed by a three[-]year grant of formal probation. However, the instant offense was violent and the defendant has shown no remorse or interest in addressing the issues that contributed to her behavior. The defendant is presumptively ineligible for probation pursuant to [section] 1203[, subdivision] (e)(4), in that the instant offense is a felony and she has had three prior felony convictions. She has two prior felony convictions related to possession [of] methamphetamine and one for possession of stolen property." The probation officer

17

recommended that probation be denied and Padilla be sentenced to a total term of four years in prison.[2]

At sentencing, the prosecution argued Padilla should be sentenced to the upper term for the elder abuse count, noting she had not taken responsibility for her actions and was unlikely to succeed on probation. The trial court denied Padilla probation, stating she was presumptively ineligible for probation and there were no unusual circumstances to overcome that presumption. The court then imposed a total term of six years in prison, consisting of an upper four-year term for the elder abuse conviction and consecutive one-year terms for each of the other two offenses.

## B

A trial court may properly indicate before trial what sentence it would impose based on a given set of facts, but it cannot engage in plea bargaining. (*People v. Clancey* (2013) 56 Cal.4th 562, 570 (*Clancey*).) A court may not treat a defendant more leniently because he or she forgoes the right to trial or more harshly because he or she exercises that right. (*Id*. at p. 575.) In general, "the indicated sentence must be the same punishment the court would be prepared to impose if the defendant were convicted at trial." (*Ibid*.)

---

2     The probation report also stated that Beverly thought Padilla should serve at least a year in local custody and then receive probation, Brent believed she should go to prison, and Edwin believed she should be sentenced to prison and "however long she is sentenced to jail or prison will not be long enough."

However, an indicated sentence is *not* a promise from the court. (*Clancey*, *supra*, 56 Cal.4th at p. 575.) By indicating a sentence, "the court has merely disclosed to the parties at an early stage—and to the extent possible—what the court views, on the record then available, as the appropriate sentence so that each party may make an informed decision." (*Ibid.*) Accordingly, if the factual predicate underlying an indicated sentence is disproved at trial, the court may withdraw that indicated sentence. (*Id.* at p. 576.) Furthermore, the court retains broad discretion to modify an intended sentence even if its factual predicate is not disproved. (*Id.* at pp. 576-577.) In particular, "[t]he development of new information at sentencing may persuade the trial court that the sentence previously indicated is no longer appropriate for this defendant or these offenses. Or, after considering the available information more carefully, the trial court may likewise conclude that the indicated sentence is not appropriate." (*Id.* at p. 576.) Therefore, a court may sentence a defendant differently than an indicated sentence based on additional new information or a reexamination of the relevant circumstances. (*Ibid.*) *Clancey* stated:

> "[A]n indicated sentence is not a promise that a particular sentence *will* ultimately be imposed at sentencing. Nor does it divest a trial court of its ability to exercise its discretion at the sentencing hearing, whether based on the evidence and argument presented by the parties or on a more careful and refined judgment as to the appropriate sentence. . . . [T]he utility of the indicated-sentence procedure . . . depends to a great extent on whether the record then before the court contains the information about the defendant and the defendant's offenses that is relevant to sentencing." (*Clancey*, *supra*, 56 Cal.4th at p. 576.)

19

Therefore, a trial court retains its full discretion at sentencing to select a fair and just punishment despite any previous indicated sentence. (*Id.* at p. 562.)

It is unconstitutional for a court to penalize a defendant who chooses to exercise his or her constitutional rights. (*U.S. v. Jackson* (1968) 390 U.S. 570, 581.) However, the imposition of a greater sentence than an indicated sentence does not, in itself, support an inference the court penalized the defendant for exercising his or her constitutional right to a trial. (*People v. Szeto* (1981) 29 Cal.3d 20, 34-35.) Instead, the record must show the court imposed a greater sentence as punishment for exercise of that right. (*People v. Angus* (1980) 114 Cal.App.3d 973, 989-990.)

C

Based on our review of the record, we conclude Padilla has not carried her burden on appeal to persuade us the trial court imposed a greater sentence than its indicated sentence as punishment for her exercise of her constitutional right to a trial. Contrary to her assertion, the court, at the time of its indicated sentence, did not have "every material piece of evidence relating to the assault on Beverly." Instead, the court had the information and the prosecution's trial brief, including its two-page description of the instant incident and Padilla's one prior felony conviction and one prior misdemeanor conviction. In contrast, at the time of sentencing, the court had additional information, including the testimony of six witnesses and various photographic and other exhibits admitted at trial, as well as the probation report. The probation report stated Padilla had *three* prior felony offenses and not just the one prior felony offense described in the prosecution's trial brief. It also showed Padilla was not remorseful for her criminal

20

behavior.  Accordingly, the court had new and/or additional information regarding the circumstances of the instant offenses and Padilla's criminal record and attitude that could have made it conclude its indicated sentence (i.e., grant of probation) was no longer appropriate and a prison term (i.e., six years in prison) was now appropriate.  (*Clancey*, *supra*, 56 Cal.4th at pp. 576-577.)  Likewise, the court may have considered more carefully the initial information it had before trial and decided based on that information, either by itself or together with the new information it received during trial and at sentencing, that a grant of probation was no longer appropriate.  (*Ibid*.)  We conclude the court did not abuse its discretion by imposing a six-year prison term rather than granting Padilla probation.  Contrary to Padilla's assertion, there is nothing in the record to support a reasonable inference that the court imposed a greater sentence as punishment for her exercise of her right to a trial.  It is mere speculation that its imposition of a six-year term rather than granting probation was, by itself, evidence that the court imposed a greater sentence to punish her for exercising her right to a trial.

DISPOSITION

The judgment is affirmed.


McDONALD, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.

21