Filed 5/31/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B260892 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA100178) |
| v. | |
| ARACELI ZENDEJAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Clifford L. Klein, Judge. Affirmed.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Jaime L. Fuster and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Araceli Zendejas appeals from the judgment entered following a jury trial in which she was convicted of two counts of first degree robbery with personal use of a knife and while a principal was armed, in violation of Penal Code sections 211, 213, subdivision (a)(1)(A), and 12022, subdivisions (a)(1) and (b)(1)[1] (counts 1 and 2); one count of criminal threats involving the personal use of a knife, in violation of sections 422 and 12022, subdivision (b)(1) (count 4); one count of false imprisonment with personal use of a knife, in violation of sections 236 and 12022, subdivision (b)(1) (count 6); one count of assault with a deadly weapon, in violation of section 245, subdivision (a)(1) (count 7); and one count of assault by means likely to produce great bodily injury, in violation of section 245, subdivision (a)(4) (count 9).[2] In a bifurcated proceeding, appellant admitted a prior serious felony strike allegation (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), and a prior prison term arising from the same conviction (§ 667.5, subd. (b)). The trial court sentenced appellant to an aggregate term of 20 years 8 months in state prison.

Appellant contends that her "involuntary torment, stress, and distress from a joint trial in close proximity to her violent, murderous codefendant" undermined her ability to follow the proceedings, participate in her defense, and communicate with counsel in violation of her state and federal constitutional rights, requiring reversal. In a related claim, appellant asserts that the trial court's abuse of discretion in refusing to consider appellant's motion for separate trials requires reversal. Finally, appellant claims that the erroneous denial of her *Marsden*[3] motion prejudicially violated her rights to counsel and a fair trial. We disagree and affirm.

---

[1] Undesignated statutory references are to the Penal Code.

[2] The jury acquitted appellant on count 3, criminal threats as to Alejandro Rosas. (§ 422.)

[3] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

2

## FACTUAL BACKGROUND

In July 2012 Alejandro Rosas Vazquez (Rosas) and his common law wife, Susanna Sanchez, were living with their one-year-old daughter in a two-bedroom apartment in Pomona. Rosas and Sanchez rented a bedroom in the apartment to Mario Garza and appellant, who was seven or eight months pregnant. Initially, Garza and appellant were quiet, and the two couples were friendly with each other. In September or October appellant gave birth to a baby boy. Sometime in early October, Rosas and Sanchez tried to raise the rent, but then asked Garza and appellant to move out because they did not like appellant going outside to smoke with her baby. Garza and appellant became angry; they had already paid rent for October and refused to leave. Rosas and Sanchez gave them another month to find a place to live, and Garza and appellant agreed to move out by October 31 or November 1, 2012.

After this, the relationship between the two couples deteriorated; they no longer greeted each other, and appellant "start[ed] talking nonsense against [Rosas and Sanchez]." Appellant and Garza also started drinking and inviting friends over, which they had been told they could not do when they moved in.

On October 24, 2012, Rosas left the apartment in the morning and returned at dusk to find appellant and Garza with another man and woman drinking beer in the living room. Rosas had seen the man and the woman once or twice before. While Sanchez and Rosas were in the kitchen making dinner, appellant looked at them and said, "Hey, come here. Come on asshole. Let's beat the shit out of each other." Rosas told his wife to take their daughter to the bedroom. Garza, appellant, and their friends left to go to a convenience store and returned sometime later with beer and food. About 11:00 p.m., Rosas joined his wife and daughter in the bedroom, locking the bedroom door behind him. Sanchez and the baby girl were on the bed, and Rosas laid down on the floor to go to sleep. He could still hear Garza, appellant, and their friends in the living room.

Sometime later, Rosas and Sanchez were suddenly awakened by a loud bang like a big crack as a man wearing a mask broke their bedroom door open. Garza followed the

3

masked man into the room and turned on the lights. Someone immediately kicked Rosas in the face, splattering blood on the wall. Garza repeatedly kicked Rosas hard all over his body, saying "that [Rosas] was fucked" and "that he was going to give [Rosas] fucking hell." The man in the mask also kicked Rosas and held a gun to his head, telling him not to move or he would kill him. At some point he hit Rosas very hard in the face with the butt of the gun.

Garza also kicked Sanchez hard in the face. Then appellant entered the room, followed by a man wearing a white T-shirt whom Rosas had seen earlier in the living room. Appellant started pulling Sanchez's hair, hitting her, and banging her head against the wall. Appellant threatened Sanchez with a knife and tried to pull Sanchez's baby out of her arms. Sanchez pulled her baby back and grabbed the knife by the blade, cutting her hand and fingers. Appellant grabbed Sanchez's neck with both hands and began to strangle her. She told Sanchez all this was happening "because [Sanchez] was a jerk" and "for messing with [appellant]." Appellant threatened to kill Sanchez if she yelled.

While appellant was choking and hitting Sanchez, Garza took Sanchez's daughter, and holding her upside down, held a knife to her back. Garza told Rosas if he moved they would hurt his little girl. The man in the mask pointed the gun at the little girl's head as Garza demanded to know where Rosas was hiding his money.

Meanwhile, the man in the white T-shirt was ransacking the room. Appellant and Garza joined the search, opening drawers, rummaging through the closet, and pulling clothes out. Garza demanded, "Where is the money?" Appellant resumed hitting Sanchez; Garza found Sanchez's purse and removed cash totaling about $4,000. Garza also took jewelry from a dresser, a box containing several watches, and rifles belonging to Rosas's cousin. Garza and appellant tried to take the television, but after unsuccessful attempts to remove it, appellant hit it with the antenna and broke it.

The entire incident lasted four to five hours. Before leaving the room, Garza and the man wearing the white T-shirt used the baby's clothing to bind Sanchez's hands and Rosas's hands and feet. Appellant continued to hit and kick Sanchez. Appellant told

4

Sanchez that if she called the police, appellant would come back and kill Sanchez and Rosas or send "people over to kill [them]." Garza also threatened to kill Sanchez and Rosas if they called the police. The four assailants went to the living room, leaving Sanchez and Rosas tied up in the bedroom. Over the next two hours, Garza returned at least twice and told Sanchez and Rosas not to try to do anything. The assailants finally left the apartment just before dawn. At some point, the kitchen was ransacked, and the front door broken.

Rosas required stitches to his nose and suffered a black eye and other injuries to his face and body. Sanchez suffered cuts to her face and fingers from her struggle with appellant over the knife. She also had marks on her neck from appellant's attempt to strangle her and injuries to her head and stomach where she had received most of the blows. After Rosas and Sanchez were released from the hospital October 25, they briefly returned to the apartment to retrieve some papers. But they never went back for their belongings or spent another night at the apartment out of fear that appellant and Garza or their acquaintances would return.

On July 19, 2013, appellant came in contact with law enforcement during an investigation at a hotel. Appellant was initially uncooperative, giving a false date of birth and falsely identifying herself as "Maria Jimenez." Police recovered a debit card bearing the name Mario Garza in appellant's hotel room. At the same time, Garza was seen running down Whittier Boulevard and through an alley. When stopped by police, he falsely identified himself as "Tony Garcia." During an interview with police on July 22, 2013, appellant gave her correct name and date of birth, explaining that she had previously given a false name because there was a warrant for her arrest for a robbery in Pomona.

5

# DISCUSSION

I. **The Joint Trial With Garza, Appellant's Codefendant, Did Not Result in Any Violation of Appellant's Constitutional Rights to Counsel or a Fair Trial**

A. *Relevant Background*

Appellant and Garza rented the room from Rosas and Sanchez as a couple and had a baby while they were living there. Sometime after the offenses in this case, appellant and Garza separated and became embroiled in a custody dispute over the baby. Appellant alleged Garza had physically and emotionally abused her. Garza shot appellant in the leg and the neck, shattering a bone in her leg which required placement of a rod from her knee down to her ankle. Appellant was wheelchair-bound during the trial in this case. As a result of her injuries, appellant suffered severe pain from swelling and was taking prescription painkillers (Motrin and Mobaxin) three times a day. At the time of the current trial, Garza had been charged with and was awaiting trial for the attempted murder of appellant.

Prior to trial, appellant complained that her attorney was not helping her in the case, and she wanted a new attorney. The court held a *Marsden* hearing in which appellant described the problem with her attorney as his failure to respond to her request for a separate trial since she was a victim of attempted murder at the hands of her codefendant. Appellant explained that sitting in court next to Garza and being so close to him all the time was "tormenting." She continued, "I have to put on a mask every time because I don't want to see him —I don't want him to see me this way. Because it's already tormenting enough the way he seen me last time, the way I had to beg for my life. [¶] . . . [¶] So it's so tormenting. I'm under medication. I'm under stress. I'm in this wheelchair because I don't know if I'm going to be able to walk. I should be paralyzed from my neck down, but I'm not. Thank God."

The court told appellant that her request was not properly part of a *Marsden* motion, and appellant responded that she knew and understood that. The court then stated

6

that appellant was not entitled to a separate trial just because she did not like her codefendant, explaining: "When two people have been alleged to have committed a crime together, they go to trial together. They don't separate it—Mr. Kwak [appellant's counsel] knows that—unless there is [*sic*] some issues about statements, which we don't have here. So we just don't do two different trials."

Concluding that appellant's motion was not about defense counsel's representation, the trial court denied the *Marsden* motion. Appellant then asked the court if there was any way Garza could be seated farther away from her, stating, "I just don't want him close to me. Every time I come, every time I go back, I'm tormented by this man. You don't realize I almost died, sir." The court responded that Garza was already as far away as space in the courtroom permitted.

**B.** ***Appellant and Garza Were Properly Tried Together, and the Trial Court Did Not Err in Denying Appellant's Request for a Separate Trial***

Expressing a clear legislative preference for joint trials, section 1098 provides in relevant part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 378; *People v. Avila* (2006) 38 Cal.4th 491, 574.) The United States Supreme Court has "repeatedly . . . approved of joint trials." (*Zafiro v. United States* (1993) 506 U.S. 534, 537.) As our Supreme Court has explained, " 'Joint trials "play a vital role in the criminal justice system." [Citation.] They promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." [Citation.]' " (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 378–379, quoting *Zafiro v. United States*, *supra*, 506 U.S. at p. 537.)

Despite the legislative preference for joint trials, a trial court may, in its discretion, order separate trials when confronted with any of a number of "nonexclusive factors," including " 'an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the

7

possibility that at a separate trial a codefendant would give exonerating testimony.' " (*People v. Avila*, *supra,* 38 Cal.4th at pp. 574–575; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40–41.) "We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion. [Citation.] If the court's joinder ruling was proper at the time it was made, a reviewing court may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' [Citation.] Even if the court abused its discretion in refusing to sever, reversal is unwarranted unless, to a reasonable probability, defendant would have received a more favorable result in a separate trial." (*People v. Avila*, *supra*, 38 Cal.4th at p. 575; *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 379; see also *People v. Carasi* (2008) 44 Cal.4th 1263, 1297–1298 ["a joint trial is prohibited only where ' "the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty" ' "].)

When, as in this case, two or more defendants are charged with committing " 'common crimes involving common events and victims,' . . . the court is presented with a ' "classic case" ' for a joint trial." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150.) We are unpersuaded that the alleged "involuntary torment, stress, and distress from a joint trial in close proximity to her violent, murderous codefendant" interfered with appellant's constitutional rights to counsel and to a fair trial, or that these circumstances justified overriding the preference for a joint trial.

Ignoring the well settled law regarding joint trials and severance, appellant analogizes her joint trial with Garza to that of a defendant forced to wear a stun belt during trial (*People v. Mar* (2002) 28 Cal.4th 1201 (*Mar*); *United States v. Durham* (11th Cir. 2002) 287 F.3d 1297 (*Durham*)), or involuntarily administered antipsychotic drugs. (*Riggins v. Nevada* (1992) 504 U.S. 127 (*Riggins*)). She asserts her "involuntary joint trial had significant mental, emotional, and psychological consequences that adversely

8

impaired her ability to concentrate on the events at trial. . . . Her torment and distress abridged and prejudicially affected her defense rights. . . . Her ability to follow the proceedings and to participate in her defense and with counsel, her outward appearance, and the substance of her communications with counsel were undermined."

Appellant's analogy is inapt, and we find no merit to appellant's claim that these authorities support reversal in this case. In *Mar*, our Supreme Court determined that the general rules governing the use of physical restraints during trial as articulated in *People v. Duran* (1976) 16 Cal.3d 282 (*Duran*) applied to the use of a remote-controlled electronic stun belt.[4] (*Mar*, *supra*, 28 Cal.4th at p. 1219.) In view of the potentially extreme psychological effects on a defendant occasioned by the anticipation and fear of accidental activation of the device, the high court concluded that "before the compelled use of such a belt can be justified for security purposes, the general standard and procedural requirements set forth in *Duran* must be met." (*Mar*, *supra*, 28 Cal.4th at pp. 1219–1220.) Finding that the trial court had not made the requisite determination that there was a manifest need to impose such a restraint for security purposes, the court concluded that the trial court had abused its discretion. (*Id*. at p. 1223.) Given "the relative closeness of the evidence, the crucial nature of defendant's demeanor while testifying, and the likelihood that the stun belt had at least some effect on defendant's demeanor while testifying," there appeared a reasonable probability the error had affected the outcome of the trial, mandating reversal. (*Id*. at p. 1225.)

---

[4] The stun belt the defendant was forced to wear in *Mar* was described as a device that " 'will deliver an eight-second, 50,000-volt electric shock if activated by a remote transmitter which is controlled by an attending officer. The shock contains enough amperage to immobilize a person temporarily and cause muscular weakness for approximately 30 to 45 minutes. The wearer is generally knocked to the ground by the shock and shakes uncontrollably. Activation may also cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. An electrical jolt of this magnitude causes temporary debilitating pain and may cause some wearers to suffer heartbeat irregularities or seizures.' " (*Mar*, *supra*, 28 Cal.4th at p. 1215.)

9

*Durham* also involved the use of a stun belt during trial. There, as in *Mar*, the Court of Appeals reversed the defendant's convictions based on the district court's failure to conduct any meaningful inquiry into the necessity for the stun belt or less restrictive alternatives, noting the stun belt's potential for interfering with a defendant's Sixth Amendment right to confer with counsel. (*Durham*, *supra*, 287 F.3d at pp. 1305, 1309.) Finally, in *Riggins*, the United States Supreme Court reversed defendant's convictions, holding that the forced administration of an antipsychotic drug during trial without any findings by the trial court about the necessity for the drug or reasonable alternatives violated the defendant's Fourteenth Amendment due process rights. (*Riggins*, *supra*, 504 U.S. at pp. 134–135, 138.)

All of these cases were solely concerned with the necessary procedural safeguards before a trial court may require a defendant to wear a stun belt during trial or be forcibly administered antipsychotic drugs. That is, the court must conduct a meaningful inquiry into the necessity for such measures and make the determination that there are no reasonable alternatives. The courts' holdings in *Mar*, *Durham*, and *Riggins* simply have no application to this case, where the trial court determined that appellant had failed to present adequate grounds for overriding the Legislature's express preference for joint trials.

Without actually identifying any of the usual grounds upon which the trial court might properly have granted her severance motion, appellant maintains that "[a] serious risk existed that a joint trial would compromise defendant's specific trial right to due process of law," and the trial court's failure to exercise its discretion was prejudicial. This assertion relies on appellant's claim based on *Mar*, *Durham*, and *Riggins* that the trial court's denial of her request for separate trials was the constitutional equivalent of being forced to wear a stun belt or be given antipsychotic drugs without the requisite determination of necessity. However, as set forth above, this argument lacks merit.

Appellant further argues that "[e]fforts to prove or disprove actual prejudice from the record would be futile." Although this assertion amounts to a concession that she has

no viable claim of prejudice, appellant nevertheless maintains that reversal is required because "[t]he government cannot prove that her defense with [*sic*] was not harmed by such interference to her ability to participate in the proceedings."  This contention overlooks the fact that it is appellant's, not the government's, burden to establish the trial court abused its discretion in denying her request for separate trials.  Appellant's failure to demonstrate how she might have received a more favorable result in a separate trial is fatal to that claim.  (See *People v. Avila*, *supra,* 38 Cal.4th at pp. 574–576; *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 378–379.)

## II.  The Trial Court Properly Denied Appellant's *Marsden* Motion

Appellant's contention that the trial court erred in denying her motion to substitute counsel is similarly without merit.  (*Marsden*, *supra*, 2 Cal.3d at p. 126.)

Appellant correctly observes that a defendant's right to assistance of counsel includes the right to discharge or substitute appointed counsel, if the failure to do so would substantially impair the rights of the accused.  (*Marsden*, *supra*, 2 Cal.3d at p. 123.)  Thus, "[w]hen a defendant seeks substitution of appointed counsel pursuant to [*Marsden*], 'the trial court must permit the defendant to explain the basis of [her] contention and to relate specific instances of inadequate performance.  A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599, quoting *People v. Smith* (2003) 30 Cal.4th 581, 604.)

Our Supreme Court has "explained that 'the decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court,' that 'a defendant has no absolute right to more than one appointed attorney,' and that a trial court is not bound to accede to a request for substitute counsel unless the defendant makes a ' " 'sufficient showing . . . that the right to the assistance of counsel would be substantially impaired' " ' if the

11

original attorney continued to represent the defendant." (*People v. Sanchez* (2011) 53 Cal.4th 80, 87; *Marsden*, *supra*, 2 Cal.3d at p. 123.)

We review the trial court's denial of a *Marsden* motion for abuse of discretion, and we find none here. (*People v. Taylor*, *supra*, 48 Cal.4th at p. 599; *People v. Barnett* (1998) 17 Cal.4th 1044, 1085.) As the trial court indicated, and appellant even conceded, the substitution request had nothing to do with appointed counsel or the quality of his representation, but was motivated entirely by appellant's desire for a separate trial. On appeal, appellant claims only that the trial court erred in refusing to substitute counsel for the same reasons it erred in denying appellant's severance request. The record is devoid of any basis for granting a *Marsden* motion. Given appellant's failure to offer a single instance of inadequate performance on the part of her counsel, much less make any showing that her right to the assistance of counsel was impaired, her claim fails.

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PUBLICATION.


LUI, J.

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

12